[Nos. D012414, D012839. Fourth Dist., Div. One. Aug. 18, 1993.]

RANDALL HOLMES, Plaintiff and Appellant, v.
GENERAL DYNAMICS CORPORATION, Defendant and Appellant.

1422

## COUNSEL

Thorsnes, Bartolotta, McGuire & Padilla, Michael Thorsnes and Suuzen Ty Anderson for Plaintiff and Appellant.

Gray, Cary, Ames & Frye, L. B. Chip Edleson, Marcelle E. Mihaila and William V. Whelan for Defendant and Appellant.

## OPINION

**WIENER, J.**—In October 1984 defendant General Dynamics (GD) terminated plaintiff Randall Holmes, a 13-year management employee. ██ ██ Finding GD fired Holmes in violation of public policy by retaliating against him for disclosing to management the company's violation of the false statements act (18 U.S.C. § 1001),[1] a jury determined Holmes was entitled to $106,000 for lost wages and benefits, $200,000 for emotional distress and $500,000 in punitive damages.[2] GD appeals, asserting the evidence was insufficient to support the judgment and instructional error.[3] Holmes cross-appeals, contending the court erred in refusing his request for prejudgment interest pursuant to Civil Code section 3291. We affirm the judgment.

---

[1] Section 1001 provides: "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both." (Hereafter section 1001.)

[2] The jury also found GD terminated Holmes without good cause in breach of an employment agreement and the implied covenant of good faith and fair dealing. GD does not challenge these findings on appeal. The jury's determination on the public policy claim is material because tort damages are permitted only where an employment termination violates public policy. (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373].)

[3] GD also does not appeal from that portion of the judgment awarding Holmes's wife, Judith Holmes, a former GD employee, damages for wrongful termination in violation of an

## FACTUAL BACKGROUND[4]

In 1971 GD hired Holmes as a management systems specialist in its electronics division (GDE), which builds and repairs electronic warfare, surveillance and navigation systems, and supplies electronics used by other GD divisions. Holmes thereafter received numerous raises, honors, awards, and promotions. In July 1982 GDE's comptroller, Claude Stoker, made Holmes GDE's business management manager, a position of increased responsibility. In this position, Holmes supervised nine staff analysts in analyzing financial data on government defense contracts. Although Holmes did not have technical financial experience or training in every relevant area, he had substantial management experience qualifying him for the position. Holmes reported directly to Stoker.

Holmes performed well during 1982 and 1983. He was "active" in discovering and resolving an accounting problem which led the division to recoup approximately $1 million. He also received a commendation letter from a GDE vice-president, praising Holmes for his "specific contributions" serving to "improve [the] future performance and the profitability of [GDE's] business." Holmes received no criticisms.[5] He believed he was doing an "exceptional" job for the division.

A July 1983 performance review supported Holmes's perception his work was well received. In the review Stoker recognized Holmes was "a mature manager" who was attempting to rebuild an "old group with new blood, ideas." As the only critical statement in the review, Stoker said Holmes "must keep in mind that the service to the Program Office is 'supreme,' the #1 objective." As part of the review, Stoker told Holmes he would not be given an annual raise because he was still in the training phase of the job. Stoker, however, assured Holmes he should not construe the absence of a raise as a criticism of his work.

Beginning in spring 1983 through the time he was terminated, Holmes reported to Stoker that GDE was violating various provisions of its defense

employment agreement and an implied covenant of good faith and fair dealing. We therefore do not discuss facts or legal theories pertaining to Judith Holmes's case against GD.

[4]Pursuant to familiar principles of appellate review, we set forth the facts in the light most favorable to the prevailing party. Although there is some merit to Holmes's argument that GD has failed to abide by the rule that an appellant challenging the sufficiency of the evidence must set forth all facts supporting the judgment, we decline to find GD has waived its right to appeal on such grounds. We will not, however, address each of GD's factual assertions to the extent that such assertion is not supported by the evidence viewed in the light most favorable to Holmes.

[5]The only evidence of any type of criticism received by Holmes was a memorandum from a fellow manager, reminding Holmes his department was responsible for regularly preparing a particular document. Holmes testified his secretary was responsible for compiling the document and that he immediately discussed the problem with her.

contracts, resulting in excessive billing to the government. (See *infra* at pp. 1427-1429.) Ignoring these reports Stoker took no responsive action. Three days after the final disclosure, Stoker called Holmes into his office and told Holmes he was removing him from his position. Stoker refused to give Holmes any reason for the termination. Contrary to the company's well-established procedures, Holmes had received no written or oral warning or counseling about the termination.[6] He was "completely caught by surprise."

Stoker told Holmes he had 90 days to find a job in another division or he would be laid off. Stoker refused Holmes's request for help in his job search; instead, Stoker directed Holmes to vacate his office and required Holmes to spend the 90-day period sitting in a "tiny" office, outside of Stoker's office. Although Holmes made numerous attempts to find a job in another division, only one division expressed interest. That division, however, suddenly turned him down after Holmes told Stoker about the possible new job. In Holmes's final termination notice, Stoker said Holmes was being terminated because "a reduction in staff [was] necessary."

At trial, Stoker said he made the decision to terminate Holmes based on a conversation with Harold Browning, the F-111 aircraft project manager (who was on the same managerial level as Stoker), who told Stoker Holmes was not adequately supporting Browning's department's work with respect to interdivision contracts (work GDE had subcontracted from other GD divisions). At trial Stoker also claimed Holmes had showed no "interest" or "drive" in the job. However, both Browning and Stoker admitted they had never documented Holmes's purported performance problems and neither could fully remember the specifics of the problem.

DISCUSSION

I.

Our Supreme Court has strongly reaffirmed the viability of the public policy exception to the at-will employment doctrine in several recent decisions. (*Gantt* v. *Sentry Insurance* (1992) 1 Cal.4th 1083, 1089-1090 [4 Cal.Rptr.2d 874, 824 P.2d 680]; *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 88-91

---

[6]When the head of the human resources department, Mr. Kulchin, first heard about Stoker's action, he told Holmes, " 'this is entirely against any company policy. Don't worry about it. . . . I'm sure you're not going to be laid off.' " Kulchin met with Stoker shortly thereafter and Stoker's only explanation for the termination was "to throw up his hands and say . . . 'you're . . .' industrial relations, 'you take care of the problem.' "

Stoker additionally sent a memorandum indirectly informing company personnel Holmes was "on his way out." Holmes's colleagues responded to the memorandum by "completely ostraciz[ing]" Holmes and refusing to "even talk" to him.

[276 Cal.Rptr. 130, 801 P.2d 373]; *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, 665-671; see also *Shoemaker* v. *Myers* (1990) 52 Cal.3d 1, 23 [276 Cal.Rptr. 303, 801 P.2d 1054].) ■ To recover in tort for wrongful discharge in violation of public policy, the plaintiff must show the employer violated a public policy affecting "society at large rather than a purely personal or proprietary interest of the plaintiff or employer." (*Gantt* v. *Sentry Insurance, supra,* 1 Cal.4th at p. 1090; see *Foley, supra,* 47 Cal.3d at pp. 669-671.) In addition, the policy at issue must be substantial, fundamental, and grounded in a statutory or constitutional provision. (*Gantt, supra,* 1 Cal.4th at pp. 1089-1095; *Sequoia Ins. Co.* v. *Superior Court* (1993) 13 Cal.App.4th 1472, 1479-1480 [16 Cal.Rptr.2d 888].) Consistent with these principles, courts have recognized tortious wrongful discharge claims where an employee establishes he was "terminated in retaliation for reporting to his or her employer reasonably suspected illegal conduct . . . that harms the public as well as the employer." (*Collier* v. *Superior Court* (1991) 228 Cal.App.3d 1117, 1119-1120 [279 Cal.Rptr. 453]; see *Gantt* v. *Sentry Insurance, supra,* 1 Cal.4th at pp. 1101-1102 (conc. opn. of Kennard, J.); *Hejmadi* v. *AMFAC, Inc.* (1988) 202 Cal.App.3d 525, 540 [249 Cal.Rptr. 5].)[7]

To establish his tortious wrongful discharge claim at trial, Holmes contended GD's assertion it fired him for inadequate performance was pretextual. Holmes maintained the real reason for his termination was to silence and punish him for his repeated disclosures of GDE's breaches of its defense contracts, breaches amounting to violations of the federal False Statements Act, which broadly prohibits parties from making false statements to a federal department or agency.[8] (§ 1001; see *ante,* p. 1423, fn. 1.) The jury found this theory credible, specifically determining GD violated the False

---

[7]In *American Computer Corp.* v. *Superior Court* (1989) 213 Cal.App.3d 664 [261 Cal.Rptr. 796] we held an employee who is fired for reporting to management ongoing illegal conduct *which does not affect the public* (as opposed to private) interest has no cause of action in tort for wrongful discharge. Here, as explained more fully below, there is no question but that GD's allegedly illegal conduct did in fact affect the *public* interest since it involved GD receiving public funds to which it was not contractually entitled.

[8]The court instructed the jury on this claim as follows: "To establish a termination of employment in violation of public policy, each of the following must be proved: (1) . . . an employer-employee relationship . . . [¶] (2) . . . the termination of plaintiff's employment was a violation of public policy. The public polic[y] of the State of California [is] . . . employers shall not terminate employees in retaliation for disclosing to the employer's management a practice of the employer to violate the False Statements Act. . . . [¶] (3) the termination of employment was a legal cause of [plaintiff's damage]; and (4) The nature and the extent of [plaintiff's damage]." The court further gave several additional instructions defining the elements of a False Statements Act violation.

Significantly, GD does not assert any error in these instructions, except for contending the term "disclosing" in the definition of the public policy should have been replaced with the word "protesting." As explained in part IV, below, we find this contention to be without merit.

Statements Act and wrongfully terminated Holmes in retaliation for his disclosing such conduct to management.

GD says its termination of Holmes on the basis of his disclosures cannot support a tortious wrongful termination claim because (1) there was insufficient evidence its breaches of the government contracts violated the False Statements Act; (2) its conduct did not implicate a fundamental public policy because the violations at issue consisted of "routine problems" inherent in the administration of government defense contracts; and (3) there was no evidence showing Holmes "protested" GD's violations. GD alternatively contends there was insufficient evidence to establish it fired Holmes because of his disclosures to management. For reasons explained below, we reject each of these contentions.

## II.

### A.

In assessing whether GD violated the False Statements Act, we briefly summarize the circumstances surrounding the relevant disclosures.

### Improper Direct Billing

In early 1983, GDE's Financial Manager Gene Hoag asked Holmes to issue him a "direct charge number" so he could charge the cost of implementing a new computer system to one particular contract, the F-16 repair contract. According to government regulations, goods or services identified specifically with one particular final product should be billed as a direct cost, whereas goods or services applicable to two or more final products should be billed as an indirect cost. Based on these rules, Holmes refused Hoag's request since GDE planned to use the computer system for many final products. Stoker was aware Holmes disagreed with Hoag's plan to bill the computer system as a direct cost. At a staff meeting shortly thereafter, Hoag told Stoker he was charging his time in implementing the computer system directly to the F-16 contract. Mr. Perkins, manager of general accounting, put his hands over his ears and said " 'don't talk about that in front of me. I don't want to hear that kind of thing.' " Following the meeting, Stoker met with Hoag and another manager and approved Hoag's request to direct charge the computer system to the F-16 contract.

### Excessive Overtime

Also in spring 1983 Holmes discovered GDE was violating provisions in several of its defense contracts limiting the government's obligation to pay

$1,000 per month in overtime absent approval.[9] Holmes told Stoker GDE's overtime charges were excessive. Stoker did nothing in response. Holmes then raised the issue at a staff meeting chaired by Stoker. Stoker again failed to take any action. In late 1984, a government audit found GDE had billed the government $260,254 in overtime without approval. After negotiations, GD repaid the government for $186,000 in excessive overtime charges. The chief government contracting officer assigned to GD testified he was not involved in these negotiations since he only becomes involved in "major" issues and the excessive overtime question was more of a "routine" contracting problem.

*Excessive Repair Charges*

Several of GDE's defense repair contracts prohibited GDE from repairing any item where the cost of parts and labor exceeded 75 percent of the item's replacement cost unless specially authorized by the government. In November 1983 Holmes hand-delivered a memorandum to Stoker stating the division had been in "noncompliance" with this provision for the past three years and there was no adequate system for monitoring compliance. Holmes concluded the memorandum by asking to further discuss the matter with Stoker. Stoker did not respond. Two weeks later, Holmes asked Stoker during a staff meeting whether he had a chance to review the memo. Stoker "waved [him] off with a hand motion." Stoker never again discussed the issue with Holmes and Holmes did not raise it with anyone else in the company. A 1984 government review later found problems in the monitoring system of the 75 percent rule. Two years later, GDE changed its system to better monitor the repair costs.

The chief government contracting officer assigned to GD testified he did not think GDE's violation of the 75 percent limitation issue was a "significant" issue "as opposed to an every-day type of a problem that comes up with government contracts." Moreover, he said that to his knowledge the government never penalized GDE for its violations of the 75 percent rule.

*Cost Overruns on Interdivision Contracts*

In spring 1983 Stoker asked Holmes and another manager to evaluate the extent of GDE's potential cost overruns on several projects GDE had subcontracted from other divisions ("interdivision contracts"). Holmes and the other manager responded by reporting that GDE was facing a potential $10 million-dollar overrun on these projects. After further investigation,

---

[9]The purpose of this limitation was to protect the government to ensure the overtime was needed and was being fairly apportioned to the government contracts.

Holmes told Stoker there were severe problems with cost overruns on interdivision contracts and that he would provide him with "a white paper" on the subject.

Shortly thereafter, on March 24, 1984, Holmes hand-delivered a document to Stoker reflecting that the estimated cost overruns had been reduced to $1.9 million and total estimated costs had remained about the same, while funding proposals for "new" work had substantially increased. When Holmes handed the memorandum to Stoker, Stoker took it, looked at it and asked, "Does anyone else have a copy of this?" Holmes said, "No." Stoker never again discussed the memo with Holmes. Stoker terminated Holmes three days later without giving him any reason.

Based primarily on Stoker's reaction to the memorandum and a comparison between the 1983 cost estimates and the cost estimates reflected in Holmes's memorandum, Holmes argued at trial that his memorandum disclosed GDE was improperly seeking increased payment from the government for "new" work which was already included in the original contract.

### B.

To establish GD violated the False Statements Act, Holmes had to show (1) GD made a statement; (2) the statement was false; (3) the false statement was made knowingly and willfully; (4) the statement was material; and (5) the statement was within the jurisdiction of a federal agency. (§ 1001; see *United States* v. *Vaughn* (9th Cir. 1986) 797 F.2d 1485, 1490; *United States* v. *Irwin* (10th Cir. 1981) 654 F.2d 671, 675-676.) GD contends Holmes failed to establish the first three elements.

*Statement*

It is well settled that charges on an invoice or other form of billing document constitute a "statement" within the meaning of section 1001. (See *United States* v. *White* (11th Cir. 1985) 765 F.2d 1469.) Viewing the evidence in the light most favorable to plaintiff, the evidence established GDE billed the installation of the new computer system as a direct cost to the F-16 contract, charged the government for overtime and parts repairs, and charged the government on interdivision assist contracts. Contrary to GD's assertions, Holmes was not required to present direct evidence that the government received a written bill from GD; rather, the jury was entitled to infer such fact from the evidence showing GD had received payment from the government for its services.

*False Statement*

Overcharging the government, or otherwise providing the government with inaccurate financial information, constitutes a "false" statement

within the meaning of section 1001. (See *U. S.* v. *White, supra,* 765 F.2d at pp. 1473-1482 [government contractor violated False Claims Act by submitting inflated cost proposals]; see also *United States* v. *Gibson* (6th Cir. 1989) 881 F.2d 318, 320-323.) There was ample evidence showing Holmes's disclosures concerned GD's providing the government with false financial information.

On the direct/indirect billing issue, Holmes's evidence[10] established Stoker's decision to bill the installation of the computer system direct to one particular contract was flatly inconsistent with the government regulations defining a direct cost. In light of such evidence, the jury was entitled to reject the testimony of GD's witnesses who opined that the direct charge was a proper interpretation of the regulations since the computer system would be used primarily for the F-16 contract.

There was likewise ample evidence showing GD overcharged the government for repairs and overtime. On the overtime issue, it was undisputed that GD later repaid the government for $186,000 in excessive overtime charges. Similarly, expert testimony substantially supported that Holmes's memorandum accurately reflected that GDE was not abiding by the 75 percent rule.

While we admit we were initially troubled by the question whether Holmes's March 24th memorandum to Stoker concerning problems with the interdivision contracts reflected a "false" statement, after carefully examining the record and viewing the evidence in the light most favorable to Holmes, we believe there was sufficient information for the jury to infer that Holmes may have unwittingly come upon GDE's scheme to manipulate the numbers to reduce its cost overrun burden, based on Stoker's reaction to the memo (asking Holmes whether any one else had seen the memo and then terminating Holmes three days later), expert testimony, and a comparison between the 1983 cost estimates and the estimates reflected in Holmes's memorandum. The fact that Holmes may not have fully understood the implications of the figures represented in his memorandum did not preclude the jury from concluding Holmes had uncovered GDE's improper practice with respect to charging on interdivision contracts.

*Knowingly and Willfully*

■ To establish an act was done "knowingly and willfully" within the meaning of section 1001, the evidence must show the party acted "voluntarily and intentionally, and not because of mistake or accident or other

---

[10]This evidence consisted primarily of Holmes's testimony and the applicable regulations. Holmes testified he had substantial experience in "direct" and "indirect" billing issues. Given this evidence, we are unpersuaded by GD's emphasis on the fact that Holmes did not bring an expert to testify on this issue.

innocent reason" and "with the specific intent to do something the law forbids." (*United States* v. *Clearfield* (E.D.Pa. 1973) 358 F.Supp. 564, 574; see *United States* v. *Carrier* (9th Cir. 1981) 654 F.2d 559, 561.)

On the direct/indirect billing issue, Stoker specifically agreed to allow the new computer system to be direct-charged to the F-16 contract, although he admitted knowing the new system was going to be used on all contracts and that an indirect cost was defined as one "identified with two or more objectives." Stoker further knew of Holmes's refusal to issue Hoag a direct charge number and chaired the managers meeting where an accounting manager covered his ears and said "don't talk about [direct charging the computer system] in front of me. I don't want to hear that kind of thing." From this evidence, a reasonable jury could conclude that Stoker authorized the improper billing, knowing such charge was a violation of proper accounting standards and resulting in overcharges to the government on the F-16 contract.

The evidence likewise showed that Holmes specifically told Stoker that it was improperly charging the government for overtime and parts repair, but that Stoker failed to take any corrective action. The jury was entitled to infer from Stoker's refusal to take any action that management was aware of and approved the overcharges and improper billing.

Finally, as explained above, Stoker's extreme reaction to Holmes's March 24th memorandum provided a substantial basis for a jury to infer Stoker's knowledge of the improper conduct.[11]

*Materiality*

█ Although GD devotes a substantial portion of its appellate briefs emphasizing the evidence showing its violations of the contracts were "routine" problems and not significant to the government, it does not suggest that its violations were not "material" within the meaning of the False Statements Act. As the jury was instructed, courts have construed the act's materiality element very broadly: "To establish materiality of a false statement it is not necessary to show that a government agency actually relied on the statement, that the government suffered pecuniary loss as a result of the statement, or that the false statement was sufficient to induce a payment or benefit. [Citations.] Rather, materiality involves only the *capability* of influencing an agency's governmental functions, i.e., does the statement have a

---

[11]Contrary to GD's repeated assertions, neither Holmes nor his experts conceded that GD's conduct was "inadvertent." GD's citation to a single ambiguous statement by Holmes during cross-examination does not convince us otherwise.

'natural tendency to influence or is it capable of influencing agency decision?' " (*United States* v. *Richmond* (8th Cir. 1983) 700 F.2d 1183, 1188; accord, *United States* v. *De Rosa* (9th Cir. 1986) 783 F.2d 1401, 1408.) There is no question here but that GD's improper billing practices had the "capability" of influencing the defense department's financial decisions.

*Conclusion*

We conclude there was substantial evidence showing Holmes's disclosures concerned GD's practices which violated the False Statements Act.

### III.

■ GD alternatively argues its violations of the False Statements Act did not implicate a "substantial" public policy and thus cannot form the basis for a tortious discharge cause of action because its conduct reflected "nothing other than routine issues inherent in the day-to-day administration of complicated government contracts." GD emphasizes evidence showing that "perfect" compliance on government contracts is impossible and warns that by affirming the jury verdict we will open the floodgate to wrongful termination suits by those defense contractor employees responsible for monitoring contract performance.

The jury found on substantial evidence GD terminated Holmes because he disclosed GD was knowingly and willfully overcharging the government. The fact that it is not uncommon for defense contractors to make errors when charging the government certainly does not lessen the fundamental public nature of the interest involved. To suggest that GD's deficiencies here were only administrative oversights ignores the jury's findings. Likewise, the fact a particular government contracting officer does not personally believe the violation was "significant" or "major" does not establish the public interest has not been detrimentally affected.

On our independent review of the record, we endorse the jury's assessment of the facts and its conclusion that GD's violations were "significant." We also agree with the trial court's observation: "[T]o the extent that there's overcharging or false statements which result in damage to the government, they result in damage to the taxpayers. They are the ultimate in a direct attack on public policy, namely that we don't lose money from the public pocket."

### IV.

■ GD contends the court erred in refusing to instruct the jury Holmes could recover on a violation of public policy theory only if he "protested to

[GD] management about the illegal policies." The court instead instructed the jury "employers shall not terminate employees in retaliation for *disclosing to* the employer's management a practice of the employer to violate the False Statements Act." (Italics added; see *ante* at p. 1426, fn. 8.) GD maintains a disclosure of illegal conduct without some form of active "protest" is insufficient to implicate a "fundamental" or "substantial" public policy and therefore cannot support a violation of public policy claim.

The dictionary defines "disclose" to mean "expose to view, as by removing a cover; uncover. . . . To make known; divulge." (American Heritage Dict. of the English Language, New College Ed. (1981) p. 375.) Applying this definition, an employer who fires an employee for "expos[ing] to view" or "mak[ing] known" an employer's illegal conduct plainly violates a "fundamental" or "substantial" public policy regardless of the militancy or the decibel level of the report, and even if the employee has chosen not to actively oppose the illegal conduct. A contrary rule would provide corporate managers incentive to terminate an employee after the employee has reported illegal activity but before the employee has had the opportunity to "protest" such activity. Moreover, such rule would unfairly penalize an employee, such as Holmes, who deems it appropriate to address the situation by working through company channels rather than engaging in some form of adversarial conduct.

*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, held a public interest was not implicated when an employer fired an employee for reporting the FBI was investigating the employee's supervisor for previous criminal conduct. In a footnote, the court explained the absence of a substantial public interest was "apparent" because the employer and employee could have properly agreed the employee should not inform the employer of any such adverse information about a co-employee's background. (*Id.* at p. 670, fn. 12.) Here, by contrast, it would be clearly improper for GD to prohibit employees, particularly employees such as Holmes whose job was to monitor contract performance, from reporting or disclosing suspected violations of governmental contracts. (See *Collier* v. *Superior Court, supra,* 228 Cal.App.3d at p. 1125 ["[a]n agreement prohibiting an employee from informing anyone in the employer's organization about reasonably based suspicions of ongoing criminal conduct . . . would be a disservice . . . to the interests of the public and would therefore present serious public policy concerns not present in *Foley*," fn. omitted].)

GD's reliance on *Hejmadi* v. *AMFAC Inc., supra,* 202 Cal.App.3d 525, is misplaced. While *Hejmadi* identified a "protest" as one element of the plaintiff's wrongful discharge public policy cause of action (*id.* at p. 540), a

careful reading of the opinion reveals the court's use of the word "protest" did not reflect the court's holding that an employee *must* actively engage in some sort of adversarial activity in order to recover on a public policy cause of action. Rather, the "protest" language was used as a shorthand expression for facts showing the employee in that case had made his views known to management by "voic[ing] concerns" and "[taking] steps to influence" the employer's illegal conduct. (*Id.* at p. 534.)

In rejecting GD's "protest" requirement we do not intend to suggest an employee's mere furnishing of information to the employer in a form which would not reveal the employer's alleged wrongful conduct except upon a detailed examination (e.g., a lengthy computerized accounting report) would suffice to support a finding that the employee has made the requisite disclosure. Rather, as in *Hejmadi*, the employee must convey the information in a form which would reasonably alert his or her employer of the nature of the problem and the need to take corrective action. As detailed above, Holmes's communications with his supervisor, a management employee, concerning GD's illegal activity was sufficient to satisfy such standard.

While there is no California case directly on point, relevant authority supports our conclusion. Our Supreme Court, for example, has recognized an employer's termination of an employee for "*reporting* an alleged violation of a statute of public importance" represents one category of wrongful discharge in violation of public policy claim. (*Gantt* v. *Sentry Insurance Company, supra,* 1 Cal.4th 1083, 1090-1091, italics added; see also conc. opn. of Kennard, J. [affirming the validity of "plaintiff's alternate theory of recovery, namely, that his employer violated public policy when it discharged him for *reporting* [to management] ongoing illegal activity within the company"] (italics added).) Likewise, *Collier* v. *Superior Court, supra,* 228 Cal.App.3d at p. 1121, expressly approved a cause of action for wrongful termination in violation of public policy where an employee alleged he was terminated for "checking on, trying to prevent, and reporting possible illegal conduct to [company] officials"].)[12]

There was no instructional error.

## V.

At trial GD claimed it fired Holmes because of job performance problems. In expressly finding GD terminated Holmes without good cause in breach of

---

[12]GD's reliance on *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311 [171 Cal.Rptr. 917] (*Pugh I*) and *Pugh* v. *See's Candies, Inc.* (1988) 203 Cal.App.3d 743 [250 Cal.Rptr. 195] (*Pugh II*) is misplaced. Neither decision held or suggested that an employee must establish he "protested" an illegal practice before he can state a wrongful termination in violation of public policy claim.

its implied employment agreement and implied covenant of good faith and fair dealing, the jury necessarily rejected GD's claim. GD does not challenge this finding. ■ Instead, GD maintains there was insufficient evidence showing that the real reason for the termination was to silence and/or punish Holmes for his disclosures about GD's contract violations. We assess this contention viewing the facts in the light most favorable to Holmes.

The undisputed evidence established Holmes had been an outstanding employee for his 13 years with the company. Yet, GD suddenly terminated him without following well-established company procedures. Not only had there been no written record of Holmes's purported deficient performance, but the person who made the decision to remove Holmes refused to give Holmes or the personnel manager any reason for Holmes's termination. Further, Holmes was provided no assistance in finding a job in another division and in fact was hindered in his job search efforts. Moreover, all of Holmes's disclosures were made within one year of his final termination and his final disclosure occurred only three days before he was terminated. It is additionally significant that Stoker ignored and/or refused to discuss each of Holmes's reports of improper activity.

Given the unchallenged fact that GD's claimed reason for firing Holmes was pretextual, these circumstances provide ample circumstantial evidence from which a reasonable jury could have concluded that Holmes was terminated in retaliation for reporting GDE's breaches of its defense contracts to management.[13]

## CROSS-APPEAL

Civil Code section 3291 (section 3291) requires a court to award prejudgment interest when a defendant refuses a plaintiff's Code of Civil Procedure section 998 settlement offer and the plaintiff later recovers a more favorable judgment.[14] (See *Gourley* v. *State Farm Mut. Auto. Ins. Co.* (1991) 53 Cal.3d 121, 125-126 [3 Cal.Rptr.2d 666, 822 P.2d 374]; *O'Hara* v. *Storer Communications, Inc.* (1991) 231 Cal.App.3d 1101, 1117 [282 Cal.Rptr. 712]; *Morin*

---

[13]The cases relied upon by General Dynamics are distinguishable. For example, in *Crosier* v. *United Parcel Service, Inc.* (1983) 150 Cal.App.3d 1132 [198 Cal.Rptr. 361] the court held the plaintiff failed to make a sufficient showing that the employer's stated reason for the discharge was pretextual since the plaintiff had admitted in his complaint he had been dismissed for the reason alleged to be pretextual. Similarly in *Burton* v. *Security Pacific Nat. Bank* (1988) 197 Cal.App.3d 972, 978 [243 Cal.Rptr. 277], the court held the trial court properly granted the employer's summary judgment motion since the plaintiff failed to bring "forth one fact . . . circumstantial or otherwise" that the employer's stated reason for discharge was pretextual.

[14]Section 3291 reads as follows: "In any action brought to recover damages for personal injury sustained by any person resulting from or occasioned by the tort of any other person [or] corporation . . . , whether by negligence or by willful intent . . . , it is lawful for the

v. *ABA Recovery Service, Inc.* (1987) 195 Cal.App.3d 200, 204-207 [240 Cal.Rptr. 509].) By its terms, section 3291 applies only to those actions "brought to recover damages for personal injury . . . resulting from . . . the tort of any other person [or] corporation . . . ." ▮▮ Holmes maintains the trial court erred in concluding a wrongful termination in violation of public policy claim does not constitute a "personal injury" action within the meaning of the statute, thereby denying him prejudgment interest.

In *Gourley,* our Supreme Court held an insurance bad faith action does not fall within the ambit of section 3291 because the "nature" or "gist" of a bad faith action "is one seeking recovery of a *property* right, not personal injury." (53 Cal.3d at p. 127.) Finding it irrelevant that the plaintiff sought emotional distress as well as economic damages, the court analyzed the issue in a broader sense, emphasizing an insurance bad faith action is brought primarily to recover financial damages and emotional distress damages are compensable only incidental to, or as an aggravation of, the economic loss. (*Id.* at pp. 128-129.)

Guided by *Gourley*'s categorical holding, we cannot say that a tortious wrongful termination action is one to recover personal injury damages within the meaning of the statute. A wrongful termination claim primarily involves the infringement of property rights, not personal injury. (See *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at pp. 682-700.) Moreover, as in *Gourley,* the nature of a tortious wrongful termination action is not to vindicate the plaintiff's personal interest. Rather, the essence of such claim is to vindicate the *public* interest. (See *Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d at p. 669 [the tort arises from a breach of a "duty which inures to the benefit of the public at large rather than to a particular employer or employee"].) The similarities between an insurance bad faith claim and a tortious wrongful termination action for purposes of this issue require us to conclude the court correctly determined section 3291 was inapplicable. (Compare *O'Hara* v. *Storer Communications, Inc., supra,* 231 Cal.App.3d 1101, 1118 [holding a plaintiff bringing a defamation action is entitled to section 3291 prejudgment interest because the "nature" of the tort is " 'an invasion of the interest in reputation and good name' " and therefore such claim seeks "to vindicate decidedly personal interests"].)

We reach the foregoing conclusion even though we are well aware that GD's conduct caused Holmes to suffer extensive personal damages. As

---

plaintiff in the complaint to claim interest on the damages alleged as provided in this section. [¶] If the plaintiff makes an offer pursuant to Section 998 . . . which the defendant does not accept prior to trial or within 30 days, whichever occurs first, and the plaintiff obtains a more favorable judgment, the judgment shall bear interest at the legal rate of 10 percent per annum calculated form the date of the plaintiff's first offer pursuant to Section 998 . . . which is exceeded by the judgment, and interest shall accrue until the satisfaction of judgment."

*Gourley* makes clear, in analyzing whether an action falls within the ambit of section 3291 a court must focus on the nature of the tort rather than the type or extent of the damages suffered in the particular case.[15]

DISPOSITION

Judgment affirmed.

Kremer, P. J., and Froehlich, J., concurred.

The petition of appellant Randall Holmes for review by the Supreme Court was denied November 10, 1993. Kennard, J., was of the opinion that the petition should be granted.

---

[15]During oral argument, Holmes directed our attention to the recent case, *Bihun* v. *AT&T Information Systems, Inc.* (1993) 13 Cal.App.4th 976 [16 Cal.Rptr.2d 787] to further support his argument the court erred in refusing to award prejudgment interest. *Bihun* held a sexual harassment action brought under the Fair Employment and Housing Act (FEHA) (see Gov. Code § 12940 et seq.) is an "action brought to recover damages for personal injury" within the meaning of section 3291. Focusing on "the nature of the action" rather than the damages sought, the court reasoned sexual harassment has the primary effect of impairing the personal well-being of the victim and is "a form of violence against women" and thus "a claim under FEHA seeks to vindicate decidedly personal rights." (*Id.* at pp. 1004-1005.) Here, by contrast, it is the employer's violation of a *public* policy resulting in the loss of a tangible *economic* benefit (a job), rather than the invasion of a personal freedom interest, which primarily defines the action. We therefore conclude *Bihun* is inapposite.