[No. B050670. Second Dist., Div. Four. Mar. 26, 1991.]

GEORGE A. COLLIER, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
MCA, INC., et al., Real Parties in Interest.

**COUNSEL**

Michael S. Duberchin for Petitioner.

No appearance for Respondent.

Rosenfeld, Meyer & Susman, Allison Weiner Fechter and Walter S. Weiss for Real Parties in Interest.

**OPINION**

**EPSTEIN, J.**—In this case we conclude that an employee who is terminated in retaliation for reporting to his or her employer reasonably suspected

illegal conduct by other employees that harms the public as well as the employer, has a cause of action for wrongful discharge.[1]

## FACTUAL AND PROCEDURAL SUMMARY

■ Because this case challenges the sustaining of a demurrer without leave to amend, "we must, under established principles, assume the truth of all properly pleaded material allegations of the complaint in evaluating the validity of the trial court's action." (*Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].) At this pleading stage, we do not decide whether petitioner will be able to prove the allegations, nor do we consider the possible difficulty in making such proof; we consider only whether he has alleged facts showing an entitlement to some relief. (See *Nagy* v. *Nagy* (1989) 210 Cal.App.3d 1262, 1267-1268 [258 Cal.Rptr. 787].)

According to the third amended complaint, petitioner George Collier worked for respondent MCA, Inc., for 10 years, rising to the position of West Coast regional manager. MCA, Inc., is in the business of producing, marketing and selling phonograph records and other recorded products. Appellant's office was located at MCA's Sun Valley distribution center. From that location, MCA shipped phonograph records and other recorded products, at no cost to the recipients, for promotional purposes. These products were known as "cleans" because they were not marked with any notation limiting them to nonsale or promotional purposes only. "Cleans" had a definite monetary value to a recipient who chose to ignore their promotional purpose, since they could be sold in the retail market or re- turned to MCA for credit, either choice resulting in profit to the recipient, who had received the products without charge.

The complaint further alleges that in early 1984, Collier became suspi- cious of criminal conduct when he noticed that certain recipients of large quantities of "cleans" did not ordinarily handle that type of product. He therefore required that shipping personnel give him copies of all documen- tation for shipping "cleans" ordered by certain MCA vice-presidents. He also reported his suspicions to higher management on at least three occa- sions between April 10 and May 30, 1984. On June 8, 1984, Collier was fired, purportedly for failing to perform his job adequately. He claims that this reason was pretextual and that he actually was terminated in retaliation

---

[1] The parties have not raised and we do not consider any issues with respect to application of the exclusive remedy provisions of the workers' compensation act to a cause of action for wrongful discharge. (See *Shoemaker* v. *Myers* (1990) 52 Cal.3d 1 [276 Cal.Rptr. 303, 801 P.2d 1054].)

for checking on, trying to prevent, and reporting possible illegal conduct to MCA officials.

Collier brought an action against MCA, Inc. In his third amended complaint, the charging pleading, he asserts three causes of action: (1) wrongful termination in violation of public policy; (2) breach of the covenant of good faith and fair dealing; and (3) breach of implied contract. MCA demurred to the first cause of action, arguing that under *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373], a plaintiff cannot state a cause of action for wrongful termination based on reporting a fellow employee's illegal conduct to his or her employer. The trial court sustained the demurrer to the first cause of action without leave to amend.

Collier filed a petition for writ of mandate, seeking an order vacating the trial court's ruling sustaining the demurrer without leave to amend. We issued an alternative writ, and now grant the relief sought.

## DISCUSSION

■ Although an employment contract of indefinite duration is generally terminable at the will of either party (Lab. Code, § 2922), for several decades our courts have recognized that an employer's traditional right to discharge an at-will employee is "subject to limits imposed by public policy, since otherwise the threat of discharge could be used to coerce employees into committing crimes, concealing wrongdoing, or taking other action harmful to the public weal." (*Foley* v. *Interactive Data Corp., supra,* 47 Cal.3d 654, 665.) Thus a tort action for wrongful discharge may lie where the termination violates a fundamental public policy. (*Tameny* v. *Atlantic Richfield Co., supra,* 27 Cal.3d 167, 176.)

In *Tameny,* the plaintiff alleged that he was terminated for refusing to engage in price fixing in violation of the Sherman Antitrust Act (15 U.S.C. § 1 et seq.) and the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.). The Supreme Court held that "the employer cannot condition employment upon required participation in unlawful conduct by the employee" and that a discharge based on an employee's refusal to engage in such conduct may give rise to a tort action for wrongful discharge. (27 Cal.3d at p. 178.) This holding was premised upon the fundamental public policies embodied in California's penal statutes. (*Id.* at p. 176.)

A public policy basis for a wrongful discharge action also has been recognized where an employee is discharged after complaining to his or her employer about working conditions or practices which the employee reasonably believes to be unsafe. In *Hentzel* v. *Singer Co.* (1982) 138

Cal.App.3d 290, 298 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015], the court noted an employer's statutory duty under Labor Code section 6400 et seq. to provide a safe and healthful work environment and to avoid hazardous conditions, and explained: "Achievement of the statutory objective—a safe and healthy working environment for all employees—requires that employees be free to call their employer's attention to such conditions, so that the employer can be made aware of their existence, and given opportunity to correct them if correction is needed. The public policy thus implicated extends beyond the question of fairness to the particular employee; it concerns protection of employees against retaliatory dismissal for conduct which, in light of the statutes, deserves to be encouraged, rather than inhibited."

The California Supreme Court further defined the public policy exception to the at-will employment doctrine in *Foley* v. *Interactive Data Corp.*, *supra*, 47 Cal.3d 654. In that case, the plaintiff alleged that he was discharged after reporting to his employer that his newly hired supervisor was currently under investigation by the Federal Bureau of Investigation for embezzlement from the supervisor's former employer. The court found this conduct did not implicate any basic public policy: "When the duty of an employee to disclose information to his employer serves only the private interest of the employer, the rationale underlying the *Tameny* cause of action is not implicated." (47 Cal.3d at pp. 670-671, fn. omitted.) The court distinguished earlier case law, explaining: "Past decisions recognizing a tort action for discharge in violation of public policy seek to protect the public, by protecting the employee who refuses to commit a crime (*Tameny*, *supra*, 27 Cal.3d 167; *Petermann*, *supra*, 174 Cal.App.2d 184 [344 P.2d 25]), who reports criminal activity to proper authorities (*Garibaldi* v. *Lucky Food Stores, Inc.* (9th Cir. 1984) 726 F.2d 1367, 1374; *Palmateer* v. *International Harvester Co.*, *supra*, 421 N.E.2d 876, 879-880), or who discloses other illegal, unethical, or unsafe practices (*Hentzel* v. *Singer Co.* (1982) 138 Cal.App.3d 290 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015] [working conditions hazardous to employees]). No equivalent public interest bars the discharge of the present plaintiff." (47 Cal.3d at p. 670.)

The case before us involves public policy implications not presented in *Foley*. The plaintiff in *Foley* merely reported that another employee was being investigated for possible past criminal conduct at a previous job. His action served only the interest of his employer. The petitioner in this case reported his suspicion that other employees were currently engaged in illegal conduct at the job, specifically conduct which may have violated laws against bribery and kickbacks (Pen. Code, § 641.3); embezzlement (Pen. Code, § 504); tax evasion (Rev. & Tax. Code, § 7152; 26 U.S.C. §§ 7201, 7202); and possibly even drug trafficking and money laundering. It is also

inferable from the pleading that the suspect conduct amounted to differential pricing, a form of price discrimination that violates federal antitrust laws (15 U.S.C. §§ 1, 13). Petitioner's report served not only the interests of his employer, but also the public interest in deterring crime and, as we next discuss, the interests of innocent persons who stood to suffer specific harm from the suspected illegal conduct. His report, then, was a disclosure of "illegal, unethical or unsafe practices" which has been recognized in California as supporting a tort action for wrongful discharge in violation of public policy. (*Foley* v. *Interactive Data Corp., supra*, 47 Cal.3d at p. 670.)

It is not just a financial loss to the employer that resulted from the alleged wrongdoing. Petitioner also alleges that MCA recording artists were deprived of royalty payments for the improperly distributed products, and that state and federal tax authorities were deprived of appropriate tax revenues for "cleans" that were improperly sold. In addition, retailers who had to pay for the MCA products that others received without charge allegedly suffered a competitive disadvantage in pricing these same products. The circle of harm resulting from the alleged wrongdoing encompassed far more than the purely private interest of petitioner's employer.

■ Labor Code section 1102.5, subdivision (b), which prohibits employer retaliation against an employee who reports a reasonably suspected violation of the law to a government or law enforcement agency, reflects the broad public policy interest in encouraging workplace "whistleblowers," who may without fear of retaliation report concerns regarding an employer's illegal conduct. This public policy is the modern day equivalent of the long-established duty of the citizenry to bring to public attention the doings of a lawbreaker. (See Comment, *Protecting the Private Sector at Will Employee Who "Blows the Whistle": A Cause of Action Based Upon Determinants of Public Policy* (1977) 1977 Wis. L. Rev. 777.) Even though the statute addresses employee reports to public agencies rather than to the employer and thus does not provide direct protection to petitioner in this case, it does evince a strong public interest in encouraging employee reports of illegal activity in the workplace. (See *Verduzco* v. *General Dynamics, Convair Div.* (S.D.Cal. 1990) 742 F.Supp. 559, 562.)

If public policy were strictly circumscribed by this statute to provide protection from retaliation only where employees report their reasonable suspicions directly to a public agency, a very practical interest in self preservation could deter employees from taking any action regarding reasonably founded suspicions of criminal conduct by coworkers. Under that circumstance, an employee who reports his or her suspicions to the employer would risk termination or other workplace retaliation. If this employee

makes a report directly to a law enforcement agency, the employee would be protected from termination or other retaliation by the employer under Labor Code section 1102.5, but would face an obvious disruption of his or her relationship with the employer, who would be in the unfortunate position of responding to a public agency without first having had an opportunity to deal internally with the suspected problem. These discouraging options would leave the employee with only one truly safe course: do nothing at all.

The situation is no better for the responsible employer, who would be deprived of information which may be vital to the lawful operation of the workplace unless and until the employee deems the problem serious enough to warrant a report directly to a law enforcement agency. Clearly, the fundamental public interest in a workplace free from illegal practices would not be served by this result.

Where, as here and in *Tameny,* the alleged misconduct involves violations of the antitrust laws, the public interest in encouraging an employee to report the violation is even clearer. Antitrust laws provide for both criminal prosecution and civil liability. (See, e.g., 15 U.S.C. §§ 1, 4, 13a.) In *Blue Shield of Virginia* v. *McCready* (1982) 457 U.S. 465, 472 [73 L.Ed.2d 149, 156, 102 S.Ct. 2540], the United States Supreme Court noted the broad scope of citizen enforcement of the antitrust laws, quoting with emphasis the language of section 4 of the Clayton Act, which provides a treble-damages remedy to " '[*a*]*ny person* who shall be injured in his business or property *by reason of anything* forbidden in the antitrust laws,' (15 U.S.C. § 15, emphasis added)." The court pointed to the lack of restrictive language in that section, explaining that it "reflects Congress' 'expansive remedial purpose' in enacting § 4: Congress sought to create a private enforcement mechanism that would deter violators and deprive them of the fruits of their illegal actions, and would provide ample compensation to the victims of antitrust violations. [Citations.] As we have recognized, '[]the statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. . . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.' [Citation.]" (457 U.S. at p. 472 [73 L.Ed.2d at p. 156].)

The public nature of the interest at stake in this case becomes apparent under the hypothetical test suggested in the margin of the *Foley* decision. (47 Cal.3d at p. 670, fn. 12) In explaining why there was no public interest in the case before it, the court noted that if an employer and employee expressly agreed that the employee had no obligation to, and should not, inform the employer of any adverse information the employee learned about

a fellow employee's background, nothing in the state's public policy would render such an agreement void. The court observed: "Because here the employer and employee could have agreed that the employee had no duty to disclose such information, it cannot be said that an employer, in discharging an employee on this basis, violates a fundamental duty imposed on all employers for the protection of the public interest." (47 Cal.3d at p. 671, fn. 12.) This is because the adverse information in *Foley* served only the employer's interest, not the public's interest, and thus there was no public interest at stake in preventing such report.

That is a critical distinction between the facts alleged in *Foley* and those in this case. As we have seen, the burden of suspected misconduct in this case was not confined to the interests of the employer alone. An agreement prohibiting an employee from informing anyone in the employer's organization about reasonably based suspicions of ongoing criminal conduct by coworkers would be a disservice not only to the employer's interests, but also to the interests of the public and would therefore present serious public policy concerns not present in *Foley*.[2]

The *Hentzel* decision, cited with approval in *Foley*, provides a useful illustration. In that case, an employee protested what he considered to be hazardous working conditions caused by other employees smoking in the workplace. He was terminated and brought an action for wrongful discharge, claiming that his termination was in retaliation for his complaints about working conditions. The *Hentzel* court held that on those facts, the employee had a viable cause of action for wrongful termination because the discharge in retaliation for his report implicated the public policy interest in a safe and healthy working environment for employees. Here, the public interest is in a lawful, not criminal, business operation. Attainment of this objective requires that an employee be free to call his or her employer's attention to illegal practices, so that the employer may prevent crimes from being committed by misuse of its products by its employees. (See *Hentzel* v. *Singer Co., supra*, 138 Cal.App.3d at p. 298.)

We recognize that a contrary result was reached in a decision by the Fourth District in *American Computer Corp.* v. *Superior Court* (1989) 213 Cal.App.3d 664 [261 Cal.Rptr. 796]. We find that case factually distinguishable, and further observe that one of the principles upon which it was based is no longer tenable in light of a recent decision by the California Supreme Court.

---

[2] We do not address internal policies that an employer might establish designating particular personnel within the organization to receive reports from employees regarding suspected criminal activity. Such arrangements do not prohibit an employee from making a report, but simply regulate the method for reporting.

In *American Computer*, the employee told his employer that he believed certain individuals were receiving consulting fees without rendering any services to the company. The employee was told not to concern himself with the consulting fees, and soon after that he was fired. Emphasizing that the employee had not been ordered to embezzle from the company and was not being punished for reporting criminal activity to law enforcement, the court concluded that no interest other than the employer's was served by the employee's report to his superiors. It therefore held that the employee had not alleged a discharge in violation of public policy within the requirements of *Foley*. (213 Cal.App.3d at p. 668.)

Looking first at the factual distinction, we note that the victim of the wrongdoing reported in *American Computer* was the employer itself, not other members of the public. The wrongdoing alleged in this case, which Collier believed violated federal antitrust laws and California laws prohibiting bribery and kickbacks, affected members of the public including recording artists, record retailers, and tax authorities, as well as the employer.

The court in *American Computer* focused on the absence of the employer's attempt to coerce the employee to engage in criminal conduct and the absence of a direct violation of a statute protecting the employee's rights. (*American Computer Corp.* v. *Superior Court, supra*, 213 Cal.App.3d at p. 668.) In *Rojo* v. *Kliger* (1990) 52 Cal.3d 65 [276 Cal.Rptr. 130, 801 P.2d 373], our Supreme Court rejected a similar argument in the context of a wrongful discharge action based on sex discrimination. It had been argued that *Tameny* claims should be limited to situations where the employer coerces an employee to commit an act that violates public policy, or restrains an employee from exercising a fundamental right, privilege or obligation. The court held that the discharge of an employee because of her resistance and objection to sexual harassment contravened a fundamental and substantial public policy. "In light of our conclusion, we reject defendant's argument that *Tameny* claims should be limited to situations where, as a condition of employment, the employer 'coerces' an employee to commit an act that violates public policy, or 'restrains' an employee from exercising a fundamental right, privilege or obligation. The contention is without merit. Although decided in the factual contexts of coercion (*Tameny, supra*, 27 Cal.3d 167) and restraint (*Foley, supra*, 47 Cal.3d 654), neither *Tameny* nor *Foley* excludes wrongful discharge claims based solely on sex discrimination or sexual harassment. To the contrary, the cases strongly imply that an action for wrongful discharge will lie when, as here, the basis of the discharge contravenes a fundamental public policy." (*Rojo* v. *Kliger, supra*, 52 Cal.3d at p. 91.)

In *Rojo, supra*, the court recognized a "fundamental public interest in a workplace free from the pernicious influence of sexism." So long as such

sexism exists, "we are *all* demeaned." (52 Cal.3d at p. 90, italics in the original.) The fundamental public interest in a workplace free from crime is no less compelling. The public policy of this state against crime in the workplace is reflected in the Penal Code sections declaring unlawful the acts of embezzlement (Pen. Code, § 504) and commercial bribery (Pen. Code, § 641.3), and in the federal antitrust laws. (See *Tameny* v. *Atlantic Richfield Co.*, *supra*, 27 Cal.3d at p. 173.) Retaliation by an employer when an employee seeks to further this well-established public policy by responsibly reporting suspicions of illegal conduct to the employer seriously impairs the public interest, even though the employee is not coerced to participate or restrained from exercising a fundamental right. The absence of such coercion and restraint does not defeat a legal action for wrongful termination. (See *Rojo* v. *Kliger*, *supra*, 52 Cal.3d at p. 91.)

### DISPOSITION

Mandate shall issue directing the respondent court to set aside its order sustaining the demurrer to petitioner's first cause of action, and to issue a new and different order overruling the demurrer to that cause of action.

George, Acting P. J., and Goertzen, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied June 27, 1991.