Filed 12/1/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| LINDA FERRICK, | H040252 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. CV233484) |
| v. | |
| SANTA CLARA UNIVERSITY, | |
| Defendant and Respondent. | |

Linda Ferrick, a former employee of Santa Clara University (SCU), a private institution, appeals from a judgment of dismissal after an order sustaining a demurrer to Ferrick's second amended complaint (complaint) without leave to amend. The complaint's sole cause of action is for wrongful termination in violation of public policy, otherwise known as a *Tameny* claim (see *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167). The court found that the complaint failed to allege that her discharge violated any fundamental public policy.

Although the complaint charges Nick Travis (Travis), allegedly SCU's "Director of Real Estate" and Ferrick's immediate supervisor, with extensive wrongdoing and inappropriate behavior, only some of that conduct was allegedly reported by Ferrick to SCU's management. Based upon her limited disclosures to SCU as alleged, Ferrick argues that the complaint states a cause of action. We conclude that the complaint does state a cause of action for wrongful termination in violation of public policy on a very narrow basis. Accordingly, we will reverse the judgment.

# I

## *Standard of Review*

Appellate review of an order sustaining a demurrer is de novo. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415.) "In reviewing the sufficiency of a complaint against a general demurrer, we are guided by long-settled rules. 'We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.]" (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

"It is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. A demurrer tests only the legal sufficiency of the pleading. [Citation.]" (*Committee On Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 214.) In reviewing the ruling on a demurrer, "the question of plaintiff's ability to prove these allegations, or the possible difficulty in making such proof does not concern the reviewing court [citations] . . . ." (*Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 496.) "To survive a demurrer, the complaint need only allege facts sufficient to state a cause of action; each evidentiary fact that might eventually form part of the plaintiff's proof need not be alleged. [Citation.]" (*C.A. v. William S. Hart Union High School Dist.* (2012) 53 Cal.4th 861, 872.) A complaint's allegations are construed liberally in favor of the pleader. (*Skopp v. Weaver* (1976) 16 Cal.3d 432, 438; see Code Civ. Proc., § 452.)

"[W]hen [the demurrer] is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of

2

discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank v. Kirwan*, *supra*, 39 Cal.3d at p. 318.) The plaintiff "must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading. [Citation.]" (*Cooper v. Leslie Salt Co*. (1969) 70 Cal.2d 627, 636.) In this case, Ferrick has not shown that her complaint may be amended in any factual respect.

## II

### *Background*

A. *Second Amended Complaint*

The complaint alleges that Ferrick worked for SCU as a senior administrator in its real estate department and Travis was the department's director. It contains allegations indicating that Travis has a bad character and behaved unprofessionally, for example, it states that Travis has a " 'playboy ethic,' " he sent " 'inappropriate emails,' " he arrived late to the office, he took long lunches, he sometimes failed to come into work, and he "frequently drank alcohol at work and left empty beer cans in his office . . . ."

The complaint generally alleges: "Ferrick witnessed and reported numerous instances of her immediate supervisor, Nick Travis . . . embezzl[ing] funds, engag[ing] in kickback schemes, evad[ing] taxes, misdirect[ing] public monies, mak[ing] false representations in real estate deals, violat[ing] state code controlling licensed realtors, and threaten[ing] public health and safety. All of these substantial policy concerns harm members of the public beyond SCU." It also states: "Travis' activities violated statutes and significant public policy concerns by harming SCU students, parents, customers, taxpayers, regulators, bond issuers, local business, and community members and is therefore a matter of public policy."

According to the complaint, Travis asked Ferrick's son-in-law, David Rego, a construction supervisor at SCU, to procure a truck for SCU's real estate department.

3

Rego procured a truck for $6,000. When processing an invoice for $21,000 from Rego in August 2011, Ferrick allegedly "changed the total from $21,000 to $27,000 believing, incorrectly, that the bill did not reflect the $6,000 for the truck." "Rego subsequently returned a check for $6,000 that was overpaid" and "Ferrick immediately deposited it in an SCU account, correcting the error."

On September 9, 2011, SCU informed Ferrick that there would be a full audit of its real estate department. SCU placed Ferrick and her son-in-law on paid administrative leave. On October 12, 2011, Travis terminated Ferrick "for 'questionable finance practices' that he characterized, at worst, 'as fraud and embezzlement from the University.' "

The allegations of the complaint indicate that at various times Ferrick made disclosures about Travis to Harry Fong, SCU's director of finance, or Sam Florio, SCU's risk manager. It also alleges that she provided a list of SCU tenants of Steve Sundeen, a property owner who paid Travis a fee of 3 percent on new leases, to SCU's budget director, Dennis Roberts, a little more than a month before SCU announced an internal audit of the real estate department.

B. *Ruling on Demurrer*

The court sustained SCU's demurrer to the complaint without leave to amend because it failed to state facts sufficient to show that the university terminated Ferrick in violation of a fundamental public policy. It found that "the alleged illegal conduct by [Ferrick's] supervisor that she reported to her superiors involved an injury only to the pecuniary interests of SCU, a private institution, and not the public at large." It indicated that Ferrick's "conclusory allegations that her supervisor's alleged conduct generally result in harm to students and others are insufficient to demonstrate that he violated laws which inure benefits to the public at large." The trial court determined that Ferrick had not shown that she could add factual allegations to state a claim.

4

III

*Discussion*

A. *Law Governing Tameny Claim*

"An action in tort seeking damages for discharge from employment in contravention of public policy is an exception to the general rule, now codified in Labor Code section 2922, that unless otherwise agreed by the parties, an employment is terminable at will. That exception was recognized in *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167 . . . ." (*Jennings v. Marralle* (1994) 8 Cal.4th 121, 129, fn. omitted.) *Tameny* stated: "[W]hen an employer's discharge of an employee violates fundamental principles of public policy, the discharged employee may maintain a tort action and recover damages traditionally available in such actions." (*Tameny*, *supra*, at p. 170.)

To prevail on a claim for wrongful termination in violation of public policy, a plaintiff must show that (1) the plaintiff was employed by the defendant, (2) the defendant discharged the plaintiff, (3) a violation of public policy was a motivating reason for the discharge, and (4) the discharge harmed the plaintiff. (See *Haney v. Aramark Uniform Services, Inc.* (2004) 121 Cal.App.4th 623, 641; CACI No. 2430.)

B. *Public Policy*

1. *Nature of Public Policy Supporting Wrongful Termination Claim*

The public policy supporting a claim of wrongful termination must meet the following four criteria: "First, the policy must be supported by either constitutional or statutory provisions. Second, the policy must be 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual. Third, the policy must have been articulated at the time of the discharge. Fourth, the policy must be 'fundamental' and 'substantial.' " (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 889-890, fn. omitted.) Administrative regulations implementing a statute may also be a

5

source of fundamental public policy. (See *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 79-80, 82 (*Green*).) The determination whether the public policy exception applies "depends in large part on whether the public policy alleged is sufficiently clear to provide the basis for such a potent remedy." (*Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1090 (*Gantt*), disapproved on another ground in *Green*, *supra*, at p. 80, fn. 6.)

2. *Whistleblower Protection for Reports of Unlawful Activity*

a. *Public Policy Embodied in Labor Code Section 1102.5, Subdivision (b)*

Ferrick asserts that she was wrongfully discharged in violation of the public policy reflected in Labor Code section 1102.5, subdivision (b),[1] which prohibits an employer from retaliating against an employee for reporting criminal or unlawful activity. Ferrick asserts that she complained about activities that she reasonably believed violated Penal Code section 641.3 (commercial bribery), California Code of Regulations, title 22, section 926-3 (taxable value of lodging), or other law.

As amended in 2003 and at the time of Ferrick's termination in 2011, former section 1102.5, subdivision (b), provided: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."[2] (Stats. 2003, ch. 484, § 2, p. 3518.)

---

[1]    All further references are to the Labor Code unless otherwise specified.

[2]    As originally enacted, section 1102.5 did not apply to rules. (Stats. 1984, ch. 1083, § 1, p. 3698.) The section was again amended in 2013 (Stats. 2013, ch. 781, § 4.1, pp. 5525-5526). Subdivision (b) of the section now provides in full: "*An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information*, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, *to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance*, or for providing information to, or (continued)

In *Green*, *supra*, 19 Cal.4th 66, the California Supreme Court observed that former section 1102.5, subdivision (b), "reflects the broad public policy interest in encouraging workplace whistle-blowers to report unlawful acts without fearing retaliation." (*Green*, *supra*, at p. 77.) It stated: "Section 1102.5, subdivision (b), concerns employees who report to public agencies. It does not protect plaintiff, who reported his suspicions directly to his employer. Nonetheless, it does show the Legislature's interest in encouraging employees to report workplace activity that may violate important public policies that the Legislature has stated." (*Ibid.*) "[A]n employee need not prove an actual violation of law; it suffices if the employer fired him for reporting his 'reasonably based suspicions' of illegal activity. [Citation.]" (*Id.* at p. 87.)

b. *Purported Commercial Bribery*

Ferrick now asserts that she reasonably believed that some of Travis's activities violated Penal Code section 641.3 and she reported them to Florio or Fong. Penal Code section 641.3, subdivision (a), provides: "Any employee who solicits, accepts, or agrees to accept money or any thing of value from a person other than his or her employer, other than in trust for the employer, corruptly and without the knowledge or consent of the employer, in return for using or agreeing to use his or her position for the benefit of that other person, and any person who offers or gives an employee money or any thing of value under those circumstances, is guilty of commercial bribery." For purposes of this statute, " '[c]orruptly' means that the person specifically intends to injure or defraud (A) his or her employer, (B) the employer of the person to whom he or she offers, gives, or agrees to give the money or a thing of value, (C) the employer of the person from

testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties." (Italics added.)

7

whom he or she requests, receives, or agrees to receive the money or a thing of value, or (D) a competitor of any such employer." (Pen. Code, § 641.3, subd. (d)(3).)

Ferrick claims that three of Travis's alleged activities provided a reasonable basis for her to believe that Travis violated Penal Code section 641.3. First, Ferrick allegedly reported to Florio "the situation" that Travis instructed her to expedite the payment of a $4,365 bill submitted by the contractor hired "to install a second electric meter at a[n] SCU address" even though he had not yet completed the work. The complaint does not contain allegations stating or showing that Ferrick had a reasonable basis to suspect that Travis solicited, accepted, or agreed to accept money or anything of value from the contractor not in trust for SCU. (See *Ibid*.; *Green*, *supra*, 19 Cal.4th at p. 87.) Ferrick's disclosure to Florio regarding the payment of the contractor was not protected by a public policy encouraging employees to report illegal activities.

The second activity involved an alleged "below-market lease agreement" between SCU and City Lights Limousines that was arranged by Travis, who allegedly ran an unpaid tab for the company's limousine services. The complaint alleged that "City Lights Limousines continually complained to Ms. Ferrick about the non-payment . . . ." At some undisclosed time (impliedly between early 2011 and July 2011 if allegations are in chronological order), Ferrick allegedly disclosed to Fong that Travis was allowing City Lights Limousines to a pay a reduced rent in exchange for Travis's personal use of its limousine services. The complaint alleged that "Travis' rent-for-rides arrangement" violated Penal Code section 641.3.

Again, there is no allegation that Travis solicited, accepted, or agreed to accept free limousine rides from City Lights Limousines *in exchange* for providing some benefit to the company. (See Pen. Code, § 641.3.) Rather, the complaint's allegations indicate that Travis simply did not pay the outstanding bill for the company's services and the company "continually complained" about it to Ferrick. The allegations do not state or

8

show that Ferrick had a reasonable basis to suspect that Travis was committing commercial bribery. (See *Green*, *supra*, 19 Cal.4th at p. 87.) Her disclosure to Fong regarding City Lights Limousines was not protected by a public policy encouraging employees to report illegal activities.

The third activity that Ferrick claims provided a reasonable basis to believe that Travis was violating Penal Code section 641.3 involved alleged "kick-backs from Steve Sundeen, who owned a commercial property near SCU's campus." The complaint alleges that, "[f]or every tenant that Mr. Travis placed in Mr. Sundeen's property, Mr. Travis received a three percent fee, which he billed through his father's company, Alto View Properties." It states that Travis placed SCU departments in Sundeen's buildings to "earn his additional payments" even though SCU had "significant vacant commercial and office space of its own . . . ." The complaint further alleges that, on August 3, 2011, "Ferrick compiled a list [for] SCU Budget Director Dennis Roberts listing ten SCU departments or groups that were paying approximately $75,000 in monthly lease payments the [*sic*] Mr. Sundeen, the property owner who paid Mr. Travis three percent on new leases." It states that Ferrick reported a "kickback" scheme when she disclosed Travis's "receipt of a three percent fee for every tenant he placed in Mr. Sundeen's building."

Those allegations, liberally construed, indicate that Travis accepted something of value (a 3 percent payment), not in trust for SCU, in return for using his position as an SCU employee to place SCU tenants with a private landlord. Accordingly, the complaint adequately pleads that Ferrick had a reasonable basis to suspect commercial bribery and disclosed her "reasonably based suspicions" to Roberts on August 3, 2011. (See *Green*, *supra*, 19 Cal.4th at p. 87.) On this very narrow basis, the complaint states a tort cause of action for wrongful termination in violation of public policy embodied in section 1102.5, subdivision (b).

9

c. *Purported Embezzlement*

Ferrick additionally argues that she had a reasonable belief that "Travis violated the law" when she "told Florio that Travis lived in SCU property rent-free and instructed her to pay for $11,000 in furnishing and décor . . . ." The complaint alleges the following. In January 2010, Travis moved into a furnished SCU apartment but he did not pay rent. In July 2010, Travis moved into a university-owned loft, he had it furnished at SCU's expense, and he did not pay rent. "Residential accommodations were not part of [Travis's] agreed upon compensation from SCU." Ferrick told Florio that Travis lived "rent-free" in the loft and Travis "had instructed her to pay $11,000 in furnishing and décor . . . with an SCU credit card." "Ferrick disclosed Travis' embezzlement" when she told "Florio that Mr. Travis decorated and lived in an SCU-financed home that was not a term of his compensation."

"Embezzlement is the fraudulent appropriation of property by a person to whom it has been intrusted." (Pen. Code, § 503; see *id.*, § 507 [a person entrusted with property as a tenant may be guilty of embezzlement].) "Embezzlement requires conversion of trusted funds [or property] coupled with the intent to defraud. [Citations.] An intent to deprive the rightful owner of possession even temporarily is sufficient . . . . [Citations.]" (*In re Basinger* (1988) 45 Cal.3d 1348, 1363-1364.) The mental state required for embezzlement "may be found to exist whenever a person, for any length of time, uses property entrusted to him or her in a way that significantly interferes with the owner's enjoyment or use of the property." (*People v. Casas* (2010) 184 Cal.App.4th 1242, 1247.) It is not embezzlement where a person honestly and in good faith "believes that he is authorized to appropriate and use property which he is accused of embezzling . . . . [Citations.]" (*People v. Stewart* (1976) 16 Cal.3d 133, 139.)

The complaint alleges that SCU's real estate department "manages roughly 100 units of housing for faculty and staff." It does not allege that the loft unit was *entrusted*

10

to Travis to be rented on behalf of SCU.  The complaint does not allege that Travis lacked authority to use SCU's credit card for the purpose of buying furnishings and decor for the SCU-owned loft or that the expenditure of $11,000 exceeded his authority.  It does not allege that Travis significantly interfered with SCU's possession, use, or enjoyment of its property.  The complaint's allegations do not state or show that Ferrick had a reasonable basis to suspect that Travis had committed embezzlement.  The complaint fails to state a cause of action for wrongful termination based upon the protected disclosure of " 'reasonably based suspicions' " of embezzlement.  (*Green*, *supra*, 19 Cal.4th at p. 87.)

d.  *Purported Violation of an Administrative Regulation*

Ferrick now asserts that she "reasonably believed that Travis' refusal to pay rent or report the free lodging as additional compensation for tax purposes was illegal" and "[h]er disclosure amounted to a report that Travis violated California Code of Regulations title 22, § 926-3."

As indicated, the complaint alleges Ferrick told Florio that "Travis lived in the loft rent free . . . ."  The complaint further states that, "[i]n disclosing to Mr. Florio that Mr. Travis lived in the SCU-owned loft rent free, Ms. Ferrick put him on notice that Mr. Travis was *evading taxes by not declaring to the IRS that the accommodation was a part of his compensation*."  (Italics added.)  It avers that "Ferrick reported tax evasion when she . . . told Mr. Florio that Mr. Travis was living rent free in SCU-financed housing that was not a term of his compensation, nor declared through payroll, harming all California citizens."

The complaint alleges that "[b]oard, lodging, or any other payment in kind, received by an employee in addition to, or in lieu of cash wages, is taxable on the basis of a reasonably estimated cash value to the employee.  Cal. Code Regs. tit. 22, § 926-3."  It further states that the State of California "collects taxes on lodging received by an

11

employee in addition to cash wages," citing California Code of Regulations, title 22, section 926-3.

California Code of Regulations, title 22, section 926-3 is not an income tax reporting law. Rather, that provision is part of the administrative regulations implementing Unemployment Insurance Code section 926, which defines "wages," the basis of contributions required by the Unemployment Insurance Code. (See Unemp. Ins. Code, §§ 131, 926, 927, 930, 976, 984, 985.) Although a significant public policy underlies the Unemployment Insurance Code (see § 100),[3] Ferrick is not relying upon that policy.

Insofar as Ferrick is attempting to invoke a public policy exception based upon her allegedly protected disclosure of a violation of income tax reporting laws, the complaint fails to identify any specific laws. (See *Gantt v. Sentry Insurance*, *supra*, 1 Cal.4th at p. 1095.) In addition, the complaint does not state or show that Ferrick had a reasonable basis to believe that, because Travis was living in the loft without paying rent, he was not fully reporting the value of any rent-free SCU housing as income on his income tax returns. The complaint fails to state a cause of action for wrongful termination based upon the protected disclosure of " 'reasonably based suspicions' " of income tax evasion. (*Green*, *supra*, 19 Cal.4th at p. 87.)

e. *Purported Violation of Vehicle Code Section 14601.1*

Ferrick's complaint alleges that Travis had his driver's license suspended for driving under the influence and he subsequently purchased, with SCU funds, "a special

---

[3] The Legislature declared in Unemployment Insurance Code section 100: "[T]he public good and the general welfare of the citizens of the State require the enactment of this measure under the police power of the State, for the compulsory setting aside of funds to be used for a system of unemployment insurance providing benefits for persons unemployed through no fault of their own, and to reduce involuntary unemployment and the suffering caused thereby to a minimum."

golf cart to get around campus."  It states that "[e]very year, SCU records the driver's license numbers of employees who drive SCU-owned vehicles."  The complaint further alleges that, in early 2010, Ferrick told SCU's risk manager, Florio, that Travis was driving the golf cart without a driver's license.  It also states that a golf cart is considered a motor vehicle under Vehicle Code section 345 and driving without a license violates Vehicle Code section 14601.1.

Although a golf cart may be a motor vehicle (Veh. Code, §§ 345, 415) and driving with a suspended or revoked license may be a crime (*id*., § 14601.1, subds. (a), (b)), Vehicle Code section 14601.1, subdivision, (c) does not prohibit "a person from driving a motor vehicle, which is owned or utilized by the person's employer, during the course of employment on private property which is owned or utilized by the employer, except an offstreet parking facility" open for use to the public.  (See *Id*., § 12500, subd. (c).) Although Ferrick is asserting that she reasonably believed that Travis was violating the law, the complaint does not state or show that Ferrick had a reasonable basis to suspect that Travis was violating Vehicle Code section 14601.1 by driving the golf cart without a license.  (See *Green*, *supra*, 19 Cal.4th at p. 87.)  The complaint alleges that Travis purchased the golf cart to "get around campus"; it contains no allegation that Travis drove the golf cart on public property or in any offstreet parking facility open for use to the public.

Ferrick has not identified a significant and fundamental public policy delineated by Vehicle Code section 14601.1 and implicated here by Travis driving a golf cart without a valid license as alleged.  (See *Gantt v*. *Sentry Insurance*, *supra*, 1 Cal.4th at p. 1095.)  Mere violation of some university policy governing the operation of vehicles used for university business is not sufficient to bring Ferrick's disclosure within a public policy exception to at-will employment.

13

3. *Whistleblower Protection Concerning Workplace Health and Safety Hazards*

Ferrick argues that her complaint states a wrongful discharge claim in violation of the public policy protecting employees from retaliation for reporting workplace health and safety violations to their employers, citing section 6310 and section 6400 et seq., which are part of California's Occupational Safety and Health Act (Cal-OSHA).[4] Section 6310, independently and together with other provisions of Cal-OSHA, reflects a significant public policy interest in encouraging employees to report health and safety hazards existing in the workplace without fear of discrimination or reprisal. (See *Freund v. Nycomed Amersham* (2003) 347 F.3d 752, 758-759; *Hentzel v. Singer Co.* (1982) 138 Cal.App.3d 290, 299-300.)

---

[4] Section 6310, subdivision (a), provides in part: "No person shall discharge or in any manner discriminate against any employee because the employee has done any of the following: [¶] (1) Made any oral or written complaint to the [Division of Occupational Safety and Health], other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, his or her employer, or his or her representative." Section 6310, subdivision (b), provides: "Any employee who is discharged, threatened with discharge, demoted, suspended, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because the employee has made a bona fide oral or written complaint to the division, other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, his or her employer, or his or her representative, of unsafe working conditions, or work practices, in his or her employment or place of employment, or has participated in an employer-employee occupational health and safety committee, shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by the acts of the employer. . . ." Section 6400, subdivision (a), states: "Every employer shall furnish employment and a place of employment that is safe and healthful for the employees therein." Section 6401.7, subdivision (a)(5) generally mandates every employer to establish a written injury prevention program that includes specified elements, including "[t]he employer's system for communicating with employees on occupational health and safety matters, including provisions designed to encourage employees to inform the employer of hazards at the worksite without fear of reprisal."

Ferrick claims that she was entitled to a safe workplace free of unlicensed drivers. The complaint does not allege, however, that Travis was driving the golf cart in a hazardous manner or that Ferrick reported to Florio that Travis was driving the golf cart while under the influence or unsafely. To be protected by a public policy, an employee "must convey the information in a form which would reasonably alert his or her employer of the nature of the problem and the need to take corrective action." (*Holmes v. General Dynamics Corp.* (1993) 17 Cal.App.4th 1418, 1434.) Although Ferrick now asserts that she "reasonably believed that Travis violated a vehicle safety statute by driving a golf cart without a license," Ferrick's alleged disclosure to Florio that Travis was driving the golf cart without a license did not convey a workplace safety hazard.

Ferrick further claims that she is entitled to a workplace without "dangerous tenants." The complaint states that she "approached" Fong in April 2008 because a commercial tenant had fallen behind in rent and the tenant was "in the news in a murder-for-hire case." It alleges that Travis had told her "not to worry about it" because the tenant and he "were friends" and, when Travis failed to "take action regarding Mr. Garcia's delinquent rent," "Ferrick brought her concerns to Mr. Fong." Although the complaint alleges that Ferrick was "concerned about the legal, ethical, and safety implications, for the workplace and community, of subsidizing a man under indictment for murder," there was no allegation that this tenant posed a danger in the workplace. Ferrick's alleged disclosure to Fong did not convey a workplace safety hazard.

The complaint's allegations do not state a cause of action for wrongful termination in violation of the public policy of encouraging employees to report workplace health or safety hazards to their employers.

4. *California False Claims Act*

Ferrick asserts that her wrongful discharge claim can also be based upon the California False Claims Act (CFCA) (Gov. Code, § 12650 et seq.). She "offers [the

15

CFCA] as another species of public policy to support the argument that SCU's decision to terminate her employment violated public policy . . . ." She points to the complaint's allegations that, on a number of dates, SCU received financing from the California Educational Facilities Authority and her alleged belief that Travis was diverting those funds.

Citing *Phillippe v. Shapell Industries* (1987) 43 Cal.3d 1247, SCU incorrectly insists that Ferrick is precluded from raising this theory for the first time on appeal. That case stated the general rule that "a party may not for the first time on appeal change his theory of recovery. [Citation.]" (*Id.* at p. 1256.) This general rule does not apply at the demurrer stage. (*Smith v. Commonwealth Land Title Ins. Co.* (1986) 177 Cal.App.3d 625, 630.) Courts "may affirm the sustaining of a demurrer only if the complaint fails to state a cause of action under any possible legal theory. [Citation.]" (*Sheehan v. San Francisco 49ers, Ltd.* (2009) 45 Cal.4th 992, 998.)

Ferrick contends that CFCA reflects a public policy protecting employees from retaliation for reporting fraud against the government. Under the CFCA, as it read at the time of Ferrick's termination, an employer was prohibited from adopting or enforcing a policy that would prevent an employee from disclosing information to a government or law enforcement agency and from discharging or otherwise discriminating against an employee for taking such action. (See Stats. 1987, ch. 1420, § 1, pp. 5245-5246 [former Gov. Code, § 12653, subds. (a) & (b)].) An employee disclosing information was required to have reasonably based suspicions of a false claim. (See *McVeigh v. Recology San Francisco* (2013) 213 Cal.App.4th 443, 456.) This statutory whistleblower provision did not, however, protect an employee who reported suspicions of a false claim directly to his or her employer.[5] (See Stats. 1987, ch. 1420, § 1, pp. 5245-5246.) It nevertheless

_____

[5] Government Code section 12653, subdivision (a), now provides in pertinent part: "Any employee . . . shall be entitled to all relief necessary to make that employee . . . (continued)

16

reflected a significant public interest in encouraging employees to disclose information potentially leading to false claim actions and protecting those that did.

Ferrick's complaint includes allegations that, "[s]ince 2002, SCU ha[d] received $575,628,877.25 from the U.S. Department of Education in the form of student loan payments and other grants" and SCU had "received financing from seventeen separate bond issuances through the California Educational Facilities Authority, the most recent for $50,125,000 beginning September 1, 2010 in part to 'finance the construction, renovation, remodeling, furnishing and equipping of certain facilities of the University . . . .' " As indicated, the complaint alleges that Ferrick told Florio that Travis "had instructed her to pay for $11,000 in furnishing and décor . . . with a SCU credit card" for the university-owned loft in which Travis lived. The complaint states that "[i]t is likely the additional furnishing [of the loft] constituted a misdirection of government funds obtained through a state-financed municipal bond." It avers that "Ferrick disclosed the misdirection of public funds" by reporting "to Mr. Florio that Mr. Travis had remodeled the SCU-owned unit he was living in with SCU-funds likely from the recent construction bond loan . . . ."

"[S]pecific allegations in a complaint control over an inconsistent general allegation. [Citations.] Under this principle, it is possible that specific allegations will render a complaint defective when the general allegations, standing alone, might have been sufficient. [Citations.]" (*Perez v. Golden Empire Transit Dist*. (2012) 209 Cal.App.4th 1228, 1236.) The complaint indicates that Travis directed Ferrick to pay for

whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of his or her employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop one or more violations of this article."

17

$11,000 in furnishings and décor for a loft owned by SCU *with an SCU credit card*, not public funds.

The complaint does not state or show that Ferrick had a reasonable basis to believe that Travis may have violated the CFCA and that her report to Florio that Travis instructed her to expend $11,000 on the SCU's credit card disclosed information relevant to such violation. (See Stats. 2009, ch. 277, §§ 1, 2, pp. 1381-1382 [former Gov. Code, § 12650], pp. 1382-1383 [former Gov. Code, § 12651].) The complaint fails to state a cause of action for wrongful termination based upon the protected disclosure of " 'reasonably based suspicions' " of a violation of the CFCA. (*Green*, *supra*, 19 Cal.4th at p. 87.)

5. *1988 Foley Decision*

Citing *Foley v. Interactive Data Corp*. (1988) 47 Cal.3d 654 (*Foley*), SCU maintains that all the alleged misconduct reported by Ferrick affected only its private interest and did not implicate a policy protecting the public and, therefore, the complaint does not state a cause of action. We consider SCU's arguments with respect to the only alleged disclosure that supports a cause of action for wrongful termination in violation of public policy, namely Ferrick's alleged disclosure that Travis received placement fees in exchange for putting SCU tenants in commercial property belonging to Sundeen.

Plaintiff Foley learned that his immediate supervisor was "currently under investigation by the Federal Bureau of Investigation for embezzlement from his former employer" and he reported this information to the company's vice president. (*Foley*, *supra*, 47 Cal.3d at p. 664.) On appeal, Foley maintained that as an agent of his employer, he had a duty to disclose that information about his coworker. (*Id*. at p. 669.) The Supreme Court concluded there was no substantial public policy prohibiting an employer from discharging an employee for reporting information that was relevant to his employer's business interests. (*Id*. at pp. 669-671.) It stated: "When the duty of an

18

employee to disclose information to his employer serves only the private interest of the employer, the rationale underlying the *Tameny* cause of action is not implicated." (*Id*. at pp. 670-671, fn. omitted.)

SCU places great weight on a footnote in *Foley*, in which the California Supreme Court indicated that a policy would be a true public policy if the policy would void an agreement between an employer and an employee that contradicted that policy. (*Foley*, *supra*, 47 Cal.3d at p. 671, fn. 12.) In *Foley*, the Supreme Court found nothing in California's public policy that would render void an agreement between an employer and employee requiring the employee to *not* "inform the employer of any adverse information" about a coworker's background. (*Ibid*.)

Subsequent to *Foley*, a split in the case law developed regarding whether an employee's disclosure that a coworker engaged in suspected unlawful conduct while employed by their mutual employer is protected by a fundamental public policy. In this case, SCU relies upon *American Computer Corp*. *v*. *Superior Court* (1989) 213 Cal.App.3d 664 (*American Computer*), which held that an employee's communications with the officers of the company about suspected embezzlement from the company do not "serve any interest other than the company's" (*id*. at p. 665) and "under *Foley* his reports will not support a wrongful termination claim." (*Id*. at pp. 665-666.) Ferrick relies upon *Collier v*. *Superior Court* (1991) 228 Cal.App.3d 1117 (*Collier*), which disagreed with *American Computer*.

In *American Computer*, the appellate court reasoned: "The most that can connect [the discharged employee's] conduct with the public interest is the argument that by reporting his suspicions to his superiors he took action which might eventually prevent or uncover commission of a felony and thereby served the laudable goal of preventing crime. However, the potential for such a public benefit is not a public interest which is weighty enough to give rise to a claim for wrongful discharge. Our conclusion in this

19

regard is based on the fact Justice Mosk, in his dissent in *Foley*, unsuccessfully advanced much the same argument." (*American Computer*, *supra*, 213 Cal.App.3d at p. 668.)

In his dissent in *Foley*, Justice Mosk had stated: "My colleagues insist that reporting the presence of an embezzler to an employer is solely to the benefit of the employer. While undoubtedly it is to the employer's benefit, it is not exclusively so. It is my opinion that such action—i.e., advising a state-created corporation of the employ in a supervisorial position of a person chargeable with a potential felony—is in the best interests of society as a whole, and therefore covered by the public policy rule. [¶] . . . It seems incongruous to permit retaliation and discharge when the employee chooses to go directly to his employer with the information, rather than to circumvent the employer, go behind his back and directly to a public agency. In either event, it seems clear to me that the law and public policy are implicated." (*Foley*, *supra*, 47 Cal.3d at p. 724 (dis. opn. of Mosk, J.).)

The appellate court in *American Computer* concluded: "Although the majority in *Foley* might have responded to Justice Mosk's dissent by pointing out that the public interest in that case was diminished because the plaintiff there was only reporting past activities of a colleague rather than, as is alleged here, ongoing criminal conduct, no such distinction appears in the majority opinion. We interpret this to mean the majority considered the entire merits of Justice Mosk's arguments and rejected them." (*American Computer*, *supra*, 213 Cal.App.3d at pp. 668-669.)

In *Collier*, a case involving writ review of an order sustaining a demurrer without leave to amend, the operative complaint alleged that George Collier, a regional manager of a record company, reported to higher management his suspicions of criminal conduct involving internal orders to ship large quantities of free promotional records that "were not marked with any notation limiting them to nonsale or promotional purposes only." (*Collier*, *supra*, 228 Cal.App.3d at p. 1120.) The complaint alleged that Collier was

20

subsequently "fired, purportedly for failing to perform his job adequately" but that reason was a pretext and his discharge was retaliatory. (*Id*. at pp. 1120-1121.)

Relying upon former section 1102.5, subdivision (b), the appellate court in *Collier* found a "fundamental public interest in a workplace free from illegal practices." (*Collier*, *supra*, 228 Cal.App.3d at p. 1124.) The court stated: "Labor Code section 1102.5, subdivision (b), which prohibits employer retaliation against an employee who reports a reasonably suspected violation of the law to a government or law enforcement agency, reflects the broad public policy interest in encouraging workplace 'whistleblowers,' who may without fear of retaliation report concerns regarding an employer's illegal conduct. This public policy is the modern day equivalent of the long-established duty of the citizenry to bring to public attention the doings of a lawbreaker. [Citation.] Even though the statute addresses employee reports to public agencies rather than to the employer and thus does not provide direct protection to petitioner in this case, it does evince a strong public interest in encouraging employee reports of illegal activity in the workplace. [Citation.]" (*Id*. at p. 1123.)

The *Collier* court distinguished *Foley*: "The case before us involves public policy implications not presented in *Foley*. The plaintiff in *Foley* merely reported that another employee was being investigated for possible past criminal conduct at a previous job. His action served only the interest of his employer. The petitioner in this case reported his suspicion that other employees were currently engaged in illegal conduct at the job, specifically conduct which may have violated laws against bribery and kickbacks (Pen. Code, § 641.3); embezzlement (Pen. Code, § 504); tax evasion (Rev. & Tax Code, § 7152; 26 U.S.C. §§ 7201, 7202) . . . ." (*Collier*, *supra*, 228 Cal.App.3d at pp. 1122-1123.) It stated that "[a]n agreement prohibiting an employee from informing anyone in the employer's organization about reasonably based suspicions of ongoing criminal conduct by coworkers would be a disservice not only to the employer's interests,

21

but also to the interests of the public and would therefore present serious public policy concerns not present in *Foley*." (*Id.* at p. 1125, fn. omitted.)

The *Collier* court concluded that, in addition to serving his employer's interest, the employee's report served "the public interest in deterring crime and . . . the interests of innocent persons who stood to suffer specific harm from the suspected illegal conduct." (*Collier*, *supra*, 228 Cal.App.3d at p. 1123.) The "circle of harm" from the alleged wrongdoing encompassed recording artists, who allegedly "were deprived of royalty payments for the improperly distributed products," state and federal tax authorities, who allegedly "were deprived of appropriate tax revenues," and retailers, who "allegedly suffered a competitive disadvantage in pricing these . . . products." (*Ibid.*)

*Collier* indicated that *American Computer*'s analysis had been undermined by *Rojo v. Kliger* (1990) 52 Cal.3d 65 (*Rojo*). (*Collier*, *supra*, 228 Cal.App.3d at pp. 1126-1127.) In *Rojo*, the California Supreme Court recognized a "fundamental *public* interest in a workplace free from the pernicious influence of sexism" (*Rojo*, *supra*, 52 Cal.3d at p. 90). Collier determined: "The fundamental public interest in a workplace free from crime is no less compelling. The public policy of this state against crime in the workplace is reflected in the Penal Code sections declaring unlawful the acts of embezzlement (Pen. Code, § 504) and commercial bribery (Pen.Code, § 641.3), and in the federal antitrust laws. (See *Tameny v. Atlantic Richfield Co.*, *supra*, 27 Cal.3d at p. 173 . . . .) Retaliation by an employer when an employee seeks to further this well-established public policy by responsibly reporting suspicions of illegal conduct to the employer seriously impairs the public interest . . . ." (*Collier*, *supra*, at p. 1127.)

We conclude that *Collier* is better reasoned. As observed in that case, *Foley* concerned an employee's disclosure that the FBI was investigating a coworker's suspected embezzlement from a *former* employer. (*Foley*, *supra*, 47 Cal.3d at p. 664.) " ' "It is axiomatic that language in a judicial opinion is to be understood in accordance

22

with the facts and issues before the court.  An opinion is not authority for propositions

not considered." ' [Citations.]" (*People v*. *Knoller* (2007) 41 Cal.4th 139, 154-155.)

We observe that *Foley* predates the 1998 decision in *Green*, *supra*, 19 Cal.4th 66.

In *Green*, the Supreme Court described its *Foley* holding as follows:  "In rejecting a tort

claim based on an employee's discharge after he reported to management his supervisor's

*history of embezzlement*, we held that alleged violations of internal practices that affect

only the employer's or employee's interest, and not the general public's interest, will not

give rise to tort damages.  (*Foley*, *supra*, 47 Cal.3d at pp. 669-671.)" (*Id*. at p. 75, italics

added.)

*Collier* is consistent with *Green*'s recognition that section 1102.5 expresses "the

broad public policy interest in encouraging workplace whistle-blowers to report unlawful

acts without fearing retaliation."  The Legislature's recent amendment of section 1102.5

to protect disclosures to employers buttresses *Collier*'s analysis.  (See fn. 2, *ante*.)  SCU

and an employee could not validly enter an agreement contravening that statute.

Here, the complaint's allegations, liberally construed, indicate that Ferrick

reasonably suspected that Travis was committing commercial bribery (Pen. Code,

§ 641.3) by taking a 3 percent placement fee for himself in return for placing SCU

tenants in property owned by Sundeen and she reported the information to SCU's Budget

Director on August 3, 2011.  This alleged misconduct did not affect only SCU's private

interest; it also implicated the public policy embodied in section 1102.5.

C. *Causation or Nexus*

SCU maintains that "there is no causal connection or temporal nexus between Ms.

Ferrick's complaints to SCU and her termination."  The university suggests this court

affirm the judgment of dismissal on the grounds that the real and valid reason for

terminating Ferrick appears on the face of her complaint and the complaint does not

23

allege facts showing a nexus between her discharge in October 2011 and her internal complaints months and years earlier.

To establish a claim for wrongful termination in violation of public policy, an employee must prove causation. (See CACI No. 2430 [using phrase "substantial motivating reason" to express causation].) Claims of whistleblower harassment and retaliatory termination may not succeed where a plaintiff "cannot demonstrate the required nexus between his reporting of alleged statutory violations and his allegedly adverse treatment by [the employer]." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1258.)

The complaint states that Travis ostensibly terminated Ferrick "for " 'questionable finance practices' that he characterized, at worst, as 'fraud and embezzlement from the University' " but it also alleges that SCU's reasons for terminating Ferrick were "clear pretext." The complaint further avers that "Ferrick's disclosures were protected conduct" and "[t]he University terminated [her] because of her protected activity." The phrase "because of" sufficiently expresses a causal link. Ferrick's alleged disclosure on August 3, 2011 and her termination in October 2011 following an internal audit were not so temporally remote as to preclude, as a matter of law, a finding of causation by a trier of fact.

SCU also asserts that this court, in assessing the sufficiency of the complaint, should consider Ferrick's allegation that "[t]he University's stated reason for terminating Ms. Ferrick is mere pretext" "in the context of her factual allegations showing that she was fired months after her last complaint of purportedly illegal activity, but shortly after issuance of the results of an audit" revealing a $6,000 discrepancy. This is a factual question that cannot be resolved on demurrer. "As a general rule in testing a pleading against a demurrer the facts alleged in the pleading are deemed to be true, however

24

improbable they may be.  [Citation.]"  (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604.)

## DISPOSITION

The judgment is reversed.

_____
ELIA, J.

WE CONCUR:


_____
RUSHING, P. J.



_____
PREMO, J.




*Ferrick v. Santa Clara University*

H040252

Trial Court:                         Santa Clara County Superior Court
                                     S.Ct. No. CV233484

Trial Judge:                         Hon. Carol W. Overton
                                     Hon. Neal Anthony Cabrinha
                                     Hon. Patricia M. Lucas


Counsel for Plaintiff and            The Employment Law Group
Appellant:                           David L. Scher


Counsel for Defendant and            Ropers, Majeski, Kohn & Bentley
Respondent:                          Michael J. Ioannou
                                     Terry Anastassiou
                                     Susan H. Handelman

*Ferrick v. Santa Clara University*

H040252