Filed 5/5/22; Certified for Publication 6/1/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CYNTHIA VATALARO,<br><br>    Plaintiff and Appellant,<br><br>  v.<br><br>COUNTY OF SACRAMENTO,<br><br>    Defendant and Respondent. | C090896<br><br>(Super. Ct. No. 34-2017-00207387-CU-WT-GDS) |

After being terminated from a position with Sacramento County (the County), Cynthia J. Vatalaro sued the County for unlawful retaliation under Labor Code section 1102.5 (section 1102.5)—a statute that protects whistleblowing employees. Under this statute, an employer cannot retaliate against an employee for disclosing information that the employee has reasonable cause to believe reveals a violation of a local, state, or federal law. Vatalaro alleged that, in violation of this statute, the County retaliated against her after she reported that she was working below her service classification.

1

The County afterward filed a motion for summary judgment. It contended that Vatalaro could not show that she had a reasonable belief, or any belief at all, that the information she disclosed evidenced a violation of any law. The County added that, regardless, Vatalaro's claim still failed because the County had a legitimate, nonretaliatory reason for terminating her—namely, she had been insubordinate, disrespectful, and dishonest. The trial court, agreeing with the County on both these points, granted summary judgment in the County's favor.

On appeal, Vatalaro alleges that the trial court was wrong on both these issues. She first argues that the facts show she had a reasonable belief that the County violated the law in having her work below her service classification, even if her belief was incorrect. She further argues that the County's stated reason for terminating her was merely a pretext for retaliation.

We affirm, though on a ground somewhat different than those raised at the trial level. The County, again, argued that Vatalaro's claim failed for two reasons, including because the County showed it had a legitimate, nonretaliatory reason for terminating her. But the relevant standard is not whether the County demonstrated it had such a reason; it is instead whether the County "demonstrate[d] by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5." (Lab. Code, § 1102.6 (§ 1102.6).) We requested supplemental briefing on this issue and, after reviewing the parties' briefing and the record, we are satisfied that the County provided sufficient undisputed evidence to support summary judgment under the appropriate standard.

BACKGROUND

I.      *Factual Background*

Vatalaro formerly worked with the County of Sacramento. In 2013, her then-supervisor, Michelle Callejas, discussed the possibility of her promoting from an

2

Administrative Analyst II, her position at the time, to an Administrative Services Officer (ASO) III. Vatalaro afterward worked with Callejas to develop the duties that would be associated with the promotion and, in 2015, she finally received the promotion to an ASO III. Under County civil service rules, Vatalaro's new position was probationary for a period of six months.

Before she started her new position, Vatalaro discovered her supervisor would be Mindy Yamasaki and received from Yamasaki a job description that listed her expected job duties. Vatalaro afterward expressed concerns about both. She first contacted a County human resources analyst and asked about the "reporting structure." In a series of emails, she indicated that she believed she should be reporting to Callejas, not Yamasaki, in her new position. But the analyst found no issue, explaining that "[t]here is nothing in the class specifications that would prohibit the reporting relationships you are proposing."

Vatalaro later expressed concerns about her assigned job duties, which differed from the duties she had developed with Callejas and the duties she believed appropriate for an ASO III. Over a phone call, according to Vatalaro, the analyst told her that her assigned duties "did not rise to the level of an ASO III" and "would cause [her] promotional issues because [she would not be] doing the duties that would prepare [her] for the next level of promotability." The analyst further, according to Vatalaro, told her "that if this particular job classification came under a study, . . . it would be unsure if [Vatalaro] would be able to remain in that job classification since it did not rise to the level." Vatalaro, around this time, also spoke with Callejas about her assigned duties. According to Vatalaro, Callejas had similar concerns as the analyst, stating that she "felt [Vatalaro's assigned job duties] were . . . below the level of classification that [Vatalaro] was going to be in."

Shortly after Vatalaro spoke with the human resources analyst and Callejas, and before Vatalaro began her new position, Vatalaro met with Yamasaki. According to Vatalaro's written notes, which all parties agree accurately recorded the facts, "[t]he

3

focus of the meeting was about [Vatalaro] having to get along with [Yamasaki's] staff." Yamasaki noted that "her staff had reservations about working with [Vatalaro]." Vatalaro responded that perhaps "her staff felt threatened by [her]" because, in the past, she had completed their work when they "weren't meeting expectations." But Yamasaki declined to give a specific reason for her staff's reservations. Vatalaro then asked about her anticipated tasks, telling Yamasaki that she already had "enough time . . . to put something together regarding [her] duties." But Yamasaki said they could discuss her tasks at a future meeting.

After beginning her new position, Valataro felt Yamasaki mistreated her on several occasions, which she believed was attributable to her complaints about her assigned job duties. First, Vatalaro believed that Yamasaki failed to assign her appropriate work. Vatalaro first raised the issue with Yamasaki a few days into her new position. At that time, after finding her assigned work too lowly for an ASO III, Vatalaro asked Yamasaki if she could do tasks that she felt better matched her position. But Yamasaki declined her request, saying, "[W]e all do staff work." A month later, Vatalaro raised the issue again, asking Yamasaki to tell Callejas that "she doesn't have assignments" at the appropriate level. But according to Vatalaro, Yamasaki said nothing in response and appeared angry.

Second, Vatalaro felt that Yamasaki excluded her from a staff appreciation meeting. After learning of the details of the meeting, Vatalaro wrote Yamasaki: "I wanted to thank you for including me in the PA appreciation breakfast, it shows how much I'm seen as part of the team." Yamasaki responded that she had informed Vatalaro about the meeting, but Valataro had "decided to take the entire day off." She also offered to meet in person to discuss the matter further. But Vatalaro felt this characterization was inaccurate. She said she understood from her conversation with Yamasaki that staff was getting "together for a catch up," not for an appreciation event that would include "treats." She also rejected the offer to meet in person, stating she felt there was "nothing

4

more to discuss" and expressing a preference for "email [in the future] so there is no misunderstanding."

Third, Valataro believed that Yamasaki assigned her certain assignments as punishment after Vatalaro complained to Callejas about Yamasaki's conduct. Vatalaro, in an email to Callejas, wrote that Yamasaki "has not given me any concessions on tasks or projects that I'd like to work on" and simply says, " '[W]ell, these (tasks) are the needs that I have here.' " Vatalaro added that she would not have "advocated so strongly to bring [Yamasaki] back to this division," following her stint with "the state for a number of years," if she "had known this was going to happen." Shortly after Vatalaro emailed Callejas, Yamasaki emailed Vatalaro. She wrote that she was "pleased to have [Vatalaro] as a member of" the management team, that she believed Vatalaro to be a "valuable part" of this team, and that, in their field, staff "get various assignments to complete that do not always align to a prescribed duty statement." She then listed "some of the initial projects [Vatalaro would] be working on." Vatalaro considered this email to be retaliatory. She reasoned, it appears, that because Yamasaki assigned her two tasks "without having a discussion about them with [her] first," and did so shortly after Valataro had emailed Callejas, that tended to show that Yamasaki had assigned these tasks to retaliate against Vatalaro.

Fourth, Vatalaro believed that Yamasaki and another co-worker, Verronda Moore, teamed up to harass her on several occasions following her further complaints about her assignments. The first time occurred when Vatalaro, during a meeting with Yamasaki, said that Moore had told her that she could not talk in a certain meeting and that, if she did, Moore would "poke [her] in the leg." According to Vatalaro, Yamasaki "was immediately upset" after Vatalaro relayed this information and called Moore into the meeting to investigate the allegation. But after Moore denied the accusation, Moore and Yamasaki yelled at Vatalaro for not "telling the truth." In Vatalaro's view, this meeting was retaliation for Vatalaro raising the issue of "being worked out of class." Following

5

the meeting, Vatalaro called Callejas and alleged that Yamasaki and Moore had harassed her. Callejas, who had a duty to report claims of harassment, afterward reported the matter to the County's Department of Personnel Services.

A second event of alleged harassment occurred a couple of weeks later at another meeting. At the start of the meeting, Moore handed Vatalaro an agenda with three sections: "Perceptions of what's working well," "Perceptions of what's not working well," and "Proposed resolutions for moving forward." All agenda items appeared to concern Vatalaro's alleged behavior. Under "what's working well," the agenda noted, among other things, "[p]leasant communication exchanges" before a certain point in Vatalaro's tenure. And under "what's not working well," the agenda noted, among other things, "[b]ody language and expressions," "[n]on-engaging behavior," and "[s]preading false rumors." Yamasaki had noted similar issues the week before, stating that Vatalaro "needed to work on [her] body language and facial expressions"—though Vatalaro said she did not understand "exactly" what Yamasaki meant at the time. After reviewing the agenda, Yamasaki and Moore described steps that Vatalaro should take to correct these issues. Vatalaro, in turn, told Yamasaki and Moore that she felt they had bullied and harassed her in their previous meeting. Yamasaki and Moore tried to defend themselves, asserting that Vatalaro was mistaken to believe that their conduct constituted harassment. But Vatalaro disagreed, stating that their yelling at her in a closed room was harassment. Vatalaro also objected to Moore's giving her assignments or "directives." Vatalaro stated that these tasks did not rise to the level of an ASO III and, in any event, she was not one of Moore's staff. Moore afterward emailed Vatalaro and asked her to identify examples when Moore had given her directives. But Vatalaro never responded.

A third event of alleged harassment occurred later that same day. According to Vatalaro's typed notes, Moore asked Vatalaro to attend a meeting with her, Yamasaki, and a co-worker who had earlier accused Vatalaro of harassment. Moore told Vatalaro that she and Yamasaki would serve as neutral facilitators. They then listened to the co-

6

worker's complaints against Vatalaro, which, according to Vatalaro, concerned the co-worker's mistaken perception that Vatalaro had questioned her work in 2013. Over the course of the meeting, Vatalaro apologized several times and Yamasaki and Moore, in turn, largely remained silent. Vatalaro appeared to believe that this meeting, like the two before it, was held in retaliation for Vatalaro's earlier complaints.

Following the last of these meetings, Yamasaki—who, like Callejas, had a duty to report claims of harassment—called the County's Department of Personnel Services to report that Vatalaro had made a harassment complaint. Yamasaki also discussed their meetings with Vatalaro over the phone. During the call, according to Vatalaro, Vatalaro mentioned that Moore had asked to meet with her to review the County's "harassment and bullying definitions." Vatalaro noted she "was not comfortable discussing the definitions of harassment and bullying with her" and wanted Moore and Yamasaki to "follow the correct protocols" for harassment complaints. She then asked Yamasaki for "advice on how to proceed" with Moore. Yamasaki responded that Vatalaro could take her time in "decid[ing] what [she] wanted to do with [Moore's request for a meeting]," though she appears not to have offered any advice on how to respond. Yamasaki then described "how difficult it's been working with [Vatalaro] because she has felt that [Vatalaro] ha[s] been distant and unwilling to cooperate." Vatalaro, in response, noted that Callejas had told her before she started her new role that Yamasaki "didn't want [her] in the management position." She then asked: "[H]ow do you expect me to react when I'm being told that I'm moving under a manager who doesn't want me and was forced to move me into the position . . . ?" After further discussion, according to Vatalaro, Yamasaki "told [her] that [they] would need to talk more and that she still hasn't decided what to do about [her] probation."

Lastly, Vatalaro believed that the County released her from probation in retaliation for her complaints. After Yamasaki notified the County's Department of Personnel Services of Vatalaro's harassment complaint, a staff member in that department contacted

Vatalaro and encouraged her to fill out an employee complaint form—though Vatalaro never ultimately did so. Around this time, Yamasaki recommended Vatalaro's release on the alleged grounds that she "ha[d] been insubordinate, disrespectful, and dishonest in her actions." In support of her recommendation, Yamasaki submitted a memorandum to Callejas that detailed various instances when, according to Yamasaki, Vatalaro exhibited these qualities. Yamasaki noted, for instance, that Vatalaro repeatedly called several work meetings "a waste of her time" and, on one occasion, declined to meet with her because she thought it would not be a "valuable use of [her] time." She added, as another example, that after she asked Vatalaro to research test analytics software for staff, Vatalaro "roll[ed] her eyes, look[ed] away, and gestur[ed] with her hands as if it were a waste of time to pursue this for . . . staff." And she further noted, among other things, that Vatalaro expressed dissatisfaction with her job and said she planned to "promote up higher" to a better position.

Shortly after Yamasaki submitted her recommendation, Callejas signed the recommendation and the County informed Vatalaro that her "employment as an Administrative Services Officer III [had been] terminated" and that she would "return to [her] previous job classification of Administrative Analyst Level II." Vatalaro afterward wrote the County that she would not return to her previous position, stating that her experience at work had left her physically sick and that she "continue[d] to suffer from such a level of anxiety that [she] ha[d] been advised not to return to such a hostile environment."

## II. Procedural Background

In 2017, over a year after being released from probation, Vatalaro sued the County. She alleged two causes of action. In the first, she asserted that the County had retaliated against her for reporting that "she was working below her classification." She then alleged that, in doing so, the County violated section 1102.5—a statute that prohibits employers from retaliating against an employee for disclosing information when "the

8

employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation. . . ." (§ 1102.5, subd. (b).) In her second cause of action, Vatalaro asserted that the County "constructively terminated her employment" in violation of public policy.

The County afterward filed a motion for summary judgment. Beginning with Vatalaro's unlawful retaliation claim, the County argued that the claim failed because Vatalaro could not establish a prima facie case of unlawful retaliation. It reasoned that "[b]ecause [Vatalaro's] complaints about her job assignments were not complaints of illegal activity, nor did [Vatalaro] have a belief that they even violated the Civil Service Rules, they are not protected activity under Labor Code § 1102.5, and any alleged harassment by her manager as a result of these complaints, is not retaliation." The County added, as relevant here, that Vatalaro's unlawful retaliation claim also failed for another reason: The "County had a legitimate, non-retaliatory reason for releasing her from probation"—namely, she had been " 'insubordinate, disrespectful, and dishonest.' " Turning next to Vatalaro's wrongful termination claim, the County argued that this claim too failed because, among other things, "a public employee cannot state a common law claim for wrongful termination in violation of public policy against a public entity employer."

After considering the County's motion and Vatalaro's opposition, the trial court granted summary judgment in the County's favor. Starting with Vatalaro's first cause of action, the court found that the County had "met its burden to show that [Vatalaro] cannot allege[] a prima facie case of retaliation because she has not alleged or presented evidence of protected conduct under this statute." The court reasoned that Vatalaro had neither "alleged that she had a reasonable belief that a *specific federal, state, or local law or regulation was violated by* [the County]," nor "presented evidence that she engaged in protected conduct," but instead had only showed that she complained about "internal

9

personnel matters." The court added that Vatalaro's claim for retaliation further failed for another reason: The County "presented evidence that it had a legitimate business reason for releasing her from probation" and Vatalaro "fail[ed] to raise a triable issue of material fact to support that the reasons given for the release from probation were 'pretext.' " Turning to Vatalaro's second cause of action, the court found, among other things, that "[t]his cause of action is barred because a public employee cannot state a common law claim for wrongful termination in violation of public policy against a public entity employer."

Vatalaro timely appealed.

## STANDARD OF REVIEW

A trial court may grant a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc. § 437c, subd. (c).)

To meet its burden on summary judgment, a moving defendant must show either that one or more elements of the plaintiff's causes of action fail or that there is a complete defense to the plaintiff's case. (Code Civ. Proc. § 437c, subd. (p)(2).) If the defendant meets this initial burden, the burden then shifts to the plaintiff to show that a triable issue of one or more material facts exists. (*Ibid.*) A triable issue of a material fact exists "if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 845 (*Aguilar*).)

We review an order granting summary judgment de novo, and " ' "liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party." ' [Citation.]" (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286.)

DISCUSSION

On appeal, Vatalaro challenges both the trial court's grounds for rejecting her claim of retaliation under section 1102.5. First, she contends the trial court wrongly concluded that she could not establish a prima facie claim of retaliation under this statute. And second, she contends the trial court wrongly found that the County presented evidence showing it had a legitimate business reason for releasing her from probation.

*I.       Framework for Evaluating Section 1102.5 Claims*

Before turning to Vatalaro's arguments, we start with the general framework for evaluating claims under section 1102.5.

According to both parties in their initial briefing (and the trial court), courts evaluate a plaintiff's section 1102.5 claim using a three-part burden-shifting framework. Under this framework, the employee must first establish a prima facie case of unlawful retaliation. Next, if the employee makes this showing, the employer then bears the burden of showing it had a legitimate, nondiscriminatory reason for the adverse employment action. Lastly, if the employer meets its burden, the burden then shifts back to the employee to show that the employer's offered reason was merely a pretext for retaliation. Several courts, including our own, have endorsed this type of framework for evaluating section 1102.5 claims. (See *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1384 ["The elements of a section 1102.5(b) retaliation cause of action require that (1) the plaintiff establish a prima facie case of retaliation, (2) the defendant provide a legitimate, nonretaliatory explanation for its acts, and (3) the plaintiff show this explanation is merely a pretext for the retaliation"]; *Mokler v. County of Orange* (2007) 157 Cal.App.4th 121 [same]; *Hager v. County of Los Angeles* (2014) 228 Cal.App.4th 1538, 1540 [same].)

But this framework for evaluating section 1102.5 claims is deeply flawed, as our Supreme Court recently explained in *Lawson v. PPG Architectural Finishes, Inc.* (2022) 12 Cal.5th 703 (*Lawson*). The principal flaw with the parties' arguments (and the cases

11

on which they rely) is that they fail to acknowledge section 1102.6. Since 2003, that statute has stated: "In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5."

The plain text of section 1102.6 undermines the parties' offered three-part test for several reasons. We focus on three. First, the parties' argument misunderstands the employer's burden of production. The parties suggest that the employer need only supply evidence showing its position is more likely true than not. The employer, in particular, need only show by a preponderance of the evidence that it had a legitimate, nondiscriminatory reason for the adverse employment action to avoid liability. (See *Aguilar, supra*, 25 Cal.4th at p. 845 [describing the "preponderance of evidence" standard].) But section 1102.6 explicitly imposes a higher burden of production, clear and convincing evidence.

Second, the parties' argument misunderstands the employer's required showing. It is not enough, as the parties have argued, that an employer shows it had a legitimate, nondiscriminatory reason for the adverse employment action. Were that the standard, then an employer could satisfy its burden simply by showing it had one legitimate reason for its action, even if several illegitimate reasons principally motivated its decision. (See *Lawson v. PPG Architectural Finishes, Inc.* (9th Cir. 2020) 982 F.3d 752, 759.) But that is not the applicable standard here. Under section 1102.6, the employer must instead show "the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5."

12

Third, the parties' argument misunderstands the employee's need to show pretext. Both parties, again, argue that the employee must show, at step three of the three-part burden-shifting framework, that the employer's proffered reason for taking an adverse action was merely a pretext for retaliation. But although that requirement may make sense under a burden-shifting framework that only requires the employer to show it had a legitimate, nondiscriminatory reason for its action, it makes no sense under the framework described in section 1102.6. As the *Lawson* court explained, "[u]nder section 1102.6, a plaintiff does not need to show that the employer's nonretaliatory reason was pretextual. Even if the employer had a genuine, nonretaliatory reason for its adverse action, the plaintiff still carries the burden assigned by statute if it is shown that the employer also had at least one retaliatory reason that was a contributing factor in the action." (*Lawson, supra*, 12 Cal.5th at p. 715-716.)

For these reasons, we decline to apply the parties' offered three-part framework for evaluating section 1102.5 claims. We instead look to section 1102.6, which "provides the governing framework." (*Lawson, supra*, 12 Cal.5th at p. 718.) To sum up the statute's requirements: "First, it places the burden on the plaintiff to establish, by a preponderance of the evidence, that retaliation for an employee's protected activities was a contributing factor in a contested employment action. . . . Once the plaintiff has made the required showing, the burden shifts to the employer to demonstrate, by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had the plaintiff not engaged in protected activity." (*Ibid.*; see also § 1102.6.)

II.     *Prima Facie Claim of Retaliation*

With this framework in mind, we turn to Vatalaro's contention that she could establish a prima facie claim of retaliation under section 1102.5—which is largely unaffected by the parties' misunderstanding of the governing framework for these types of claims.

13

Section 1102.5, subdivision (b), as noted, prohibits employers from retaliating against whistleblowing employees. Relevant here, it states: "An employer . . . shall not retaliate against an employee for disclosing information . . . to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties." (§ 1102.5, subd. (b).)

Although the statute speaks in terms of employees who have "reasonable cause to believe" that the information they reveal discloses a violation of or noncompliance with a local, state, or federal law, all parties in this case appear to construe it to refer to employees who "reasonably believe" that the information they reveal discloses a violation of or noncompliance with the law. In Vatalaro's words, for instance, the statute "merely requires [that she] *had a reasonable belief* that [the County's] conduct violated the law or that it engaged in conduct that was noncompliant with a local, state, or federal rule or regulation." (Original italics and underscores omitted.) And in the County's similar words, "employees are protected from retaliation as whistleblowers if they *reasonably believe* their employer is engaged in illegal activity, and the employee discloses information regarding the suspected illegal activity to a government or law enforcement agency." Several courts have interpreted the statute similarly. (See, e.g., *Nejadian v. County of Los Angeles* (2019) 40 Cal.App.5th 703, 719 (*Nejadian*) ["under subdivision (b) of section 1102.5, . . . the employee must show only that he or she *reasonably believed* that there was a violation of a statute, rule, or regulation"]; *Collier v. Superior Court* (1991) 228 Cal.App.3d 1117, 1123 (*Collier*) [§ 1102.5 protects employees who report "a *reasonably suspected* violation of the law . . ."].)

14

We assume for a moment that the parties' reading of the statute is correct. Under this reading, we find Vatalaro's challenge to the trial court's decision falls short. The trial court, again, concluded that Vatalaro could not establish a prima facie claim of retaliation, because she could not show she had a reasonable belief that the law had been violated. Challenging this conclusion, Vatalaro argues that she believed her assigned duties violated state "civil service rules" and that, for various reasons, her belief was reasonable. But as the County notes, Vatalaro ignores a significant issue in making this argument: She earlier conceded that she had no such belief during discovery. When asked at her deposition whether "it was her understanding" that her job description "violated civil service rules," Vatalaro first offered an evasive response. But when the County's attorney pressed the point, Vatalaro said, "I don't know"—which we understand to be a clear concession that she did not have an understanding that her job description "violated civil service rules." After further questioning, Vatalaro said her job description violated two things, neither of which included any civil service rule: "It violated the agreement [she] had with [Callejas] and . . . also violated some type of policy with HR." Considering Vatalaro's deposition testimony, we cannot accept her current claim that she in fact did believe her job description violated "civil service rules."

We find that true even though Vatalaro, in a declaration following her deposition, contradicted her deposition testimony. Shortly after her deposition, Vatalaro said in a declaration that she believed her job description "did not comply with the Civil Service Requirements." Vatalaro, in other words, contradicted her earlier admission that she did not believe her job description "violated civil service rules." But we find this belated declaration could not undo her earlier deposition admission. As other courts have explained, even at the summary judgment stage, courts "may give 'great weight' to admissions made in discovery and 'disregard contradictory and self-serving affidavits of the party.' " (*Whitmire v. Ingersoll-Rand Co.* (2010) 184 Cal.App.4th 1078, 1087.) Applying this principle in this case, we find it appropriate to disregard Vatalaro's

15

declaration about her understanding of civil service rules in light of her earlier, contradictory deposition testimony on the same topic.

But all that said, we are not convinced that Vatalaro's actual beliefs are the relevant consideration under section 1102.5—even though both parties argue otherwise on this point. Under the parties' understanding, again, the phrases "reasonable cause to believe" and "reasonably believed" are equivalent. And so, when section 1102.5 refers to employees who had "reasonable cause to believe" that the information they revealed disclosed a violation of the law, the statute in effect refers to employees who "reasonably believed" that the information they revealed disclosed a violation. Many, perhaps most, decisions interpreting section 1102.5 have endorsed a similar reading. (See, e.g., *Nejadian*, *supra*, 40 Cal.App.5th at p. 719 ["under subdivision (b) of section 1102.5, . . . the employee must show only that he or she *reasonably believed* that there was a violation of a statute, rule, or regulation"]; *Ross v. County of Riverside* (2019) 36 Cal.App.5th 580, 593 [§ 1102.5 "requires only that an employee disclose information and that the employee *reasonably believe* the information discloses unlawful activity"]; *Siri v. Sutter Home Winery, Inc.* (2019) 31 Cal.App.5th 598, 605 ["Plaintiff's right to recover turns only on whether she was discharged for communicating her *reasonable belief* that defendant was not properly reporting its use tax obligation."]; *Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 850 [an employee must at least "voice a *reasonable suspicion* that a violation of a constitutional, statutory, or regulatory provision has occurred"]; *Collier, supra*, 228 Cal.App.3d at p. 1123 [same].)[1]

---

[1] Our Supreme Court, citing *Collier*, found in one case that an employee's " 'reasonably based suspicions' " were enough to trigger section 1102.5. (*Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 87.) But the court did not discuss the outer reach of the statute's "reasonable cause to believe" language. It did not, for example, discuss whether an employee who had reasonable cause to be suspicious, but was not in fact suspicious, could also invoke the statute.

But despite these many cases supporting the parties' reading, we hesitate to interpret section 1102.5 similarly. The courts in these several cases, for whatever reason, appeared to have equated "reasonable cause to believe" with "reasonably believes." And perhaps, given the facts of these cases, their doing so was immaterial. But these phrases are not equivalent. A person, after all, may have "reasonable to cause to believe" that something is true, even if she does not in fact believe it to be true. The Legislature has itself recognized as much in other circumstances. (See Pen. Code, § 26 [recognizing that defendants may have had reasonable cause to believe their lives were endangered even if they did not in fact believe their lives were endangered; duress is a defense to any noncapital crime where defendants acted "under threats or menaces sufficient show that they had *reasonable cause to and did believe* their lives would be endangered if they refused"].) So too have other courts. (See, e.g., *Bernstein v. South Cent. Bell Telephone Co.* (5th Cir. 1984) 730 F.2d 987, 991 ["the district court's finding turns not on what [the defendant] in fact believed, but on what [it] had 'reasonable cause' to believe"]; *Yorke v. Thomas Iseri Produce Co.* (7th Cir. 1969) 418 F.2d 811, 814 ["the decision turns not on what the officers of the bank in fact believed, but on what they had 'reasonable cause' to believe"].)

Considering the generally acknowledged distinction between a person who has cause to believe something is true and a person who actually believes something is true, we harbor serious doubts about the parties' understanding of section 1102.5. But we stop short of rejecting their reading altogether. In some circumstances, notably, courts have construed "reasonable cause to believe" to mean "reasonable cause to believe" *and* "actually believes." That was true, for example, in *People v. Gonzales* (2013) 56 Cal.4th 353. Our Supreme Court there construed Evidence Code section 1024, which creates an exception to the psychotherapist-patient privilege when "the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the

17

communication is necessary to prevent the threatened danger." Although the statute, by its terms, only requires the psychotherapist to have "reasonable cause to believe" the patient is dangerous, the court found a broader interpretation appropriate after considering "the Law Revision Commission Comment accompanying this exception." The court reasoned that this comment "indicates that the drafters intended the exception to come into play only when the therapist has reasonable cause to believe *and* actually believes that the patient is dangerous." (*People v. Gonzales*, *supra*, 56 Cal. 4th at p. 381, fn. 12, italics added.) Perhaps similar considerations could favor a similar reading of section 1102.5. But because, as we turn to next, we conclude that the trial court's decision can be sustained on an alternative ground, we need not pursue this issue further.

### III. *Legitimate, Nonretaliatory Reason*

We consider next Vatalaro's contention that the County's stated grounds for releasing her from probation "lack[] credence and competent evidence" and were merely a "pretext" for retaliation.

Vatalaro's argument on this point follows from her (and the County's and the trial court's) initial misunderstanding of the governing framework for section 1102.5 claims. Again, all proceeded on the understanding that an employer could defeat an employee's retaliation claim under section 1102.5 if (1) it showed it had a legitimate, nondiscriminatory reason for the adverse employment action and (2) the employee failed to show its proffered reason was merely a pretext for discrimination. But as covered above, their understanding was flawed. Once an employee makes a prima facie case under section 1102.5, the employer must do more than show it had a legitimate, nondiscriminatory reason for the adverse employment action. It must, per section 1102.6, "demonstrate, by clear and convincing evidence, that it would have taken the action in question for legitimate, independent reasons even had the plaintiff not engaged in protected activity." (*Lawson, supra*, 12 Cal.5th at p. 718; see also § 1102.6.) And, as the

18

*Lawson* court explained, the employee need not "show that the employer's nonretaliatory reason was pretextual." (*Id.* at p. 716.)

Because all parties (and the trial court) relied on the wrong standard at the trial level, and because the parties continued to rely on this standard in their initial briefs on appeal, we asked the parties to submit supplemental briefing to account for *Lawson* and section 1102.6. According to Vatalaro's supplemental briefing, the County's evidence was insufficient to show that her release from probation would have happened even had she not complained that she was working on low-level assignments. But according to the County's supplemental briefing, the County met its burden "to establish by clear and convincing evidence that it would have made the same employment decision without [the] alleged protected conduct." We ultimately agree with the County. Although the County pointed to the wrong standard in its motion for summary judgment, it nonetheless supplied sufficient evidence to satisfy the more demanding standard under section 1102.6. In particular, it demonstrated by clear and convincing evidence that it would have released Vatalaro from probation for legitimate, independent reasons even had Vatalaro not engaged in the allegedly protected conduct.

The County, again, offered three reasons for its decision to release Vatalaro from probation: Vatalaro had been " 'insubordinate, disrespectful, and dishonest.' " Yamasaki described her reasons for reaching this conclusion in a memorandum recommending Vatalaro's release. She stated, for instance, that Vatalaro had been dishonest on several occasions. On one occasion, for example, she noted that Vatalaro "indicated that she could not complete her work as she could not talk directly to" a co-worker during a meeting. Vatalaro explained that Moore had prohibited her from speaking during the meeting. But after Moore said that Vatalaro did speak in the meeting, Vatalaro admitted that she in fact "did participate in the meeting by talking and asking questions."

Yamasaki further stated that Vatalaro had repeatedly been insubordinate and disrespectful. She wrote that Vatalaro repeatedly called several work meetings "a waste

19

of her time" and, on one occasion, declined to meet with her because she thought it would not be a "valuable use of [her] time." She added that after she asked Vatalaro to research test analytics software for staff, Vatalaro "roll[ed] her eyes, look[ed] away, and gestur[ed] with her hands as if it were a waste of time to pursue this for . . . staff." She noted that after she sought Vatalaro's assistance on another occasion, Yamasaki emailed: "Anytime you need another secretary, just let me know." She wrote that after she requested an update from Vatalaro on a project, Vatalaro sent her an email with the subject line "Dear Fran," in reference to a former County employee who had a poor reputation as a manager. She stated that, following a misunderstanding about an assignment, Vatalaro wrote "a disrespectful and unprofessional" email that accused Yamasaki of wasting her time. And she noted, among other things, that Vatalaro expressed dissatisfaction with her job and said she planned to "promote up higher" to a better position.

Vatalaro, as best we can tell, never meaningfully disputed the alleged act of dishonesty discussed above. She did, however, offer additional facts. Yamasaki, again, noted that Vatalaro "indicated that she could not complete her work as she could not talk directly to" a co-worker during a meeting, but she then later admitted she "did participate in the meeting by talking and asking questions." Touching on this topic at her deposition, Vatalaro maintained that Moore did in fact instruct her not to speak during this meeting. But Yamasaki never said any differently in recommending Vatalaro's release. She instead accused Vatalaro of acting dishonestly because she "indicated that she could not complete her work as she could not talk directly to" the co-worker during the meeting, even though she ultimately conceded she "did participate in the meeting by talking and asking questions." Whether Moore initially instructed Vatalaro not to speak in the meeting thus appears to have been immaterial to Yamasaki's reasoning for finding Vatalaro acted dishonestly.

Vatalaro also, as far as we can tell, never disputed the alleged acts of disrespectful and insubordinate conduct discussed above. And considering the undisputed evidence of her emails, her declining to do so is perhaps not surprising. Early in Vatalaro's tenure as an ASO III, for instance, Yamasaki emailed Vatalaro to set up a one-on-one meeting and mentioned some agenda topics for the meeting. But Vatalaro responded that "[t]hese agenda items have already been given to you as far as updates go." She then added: "I would like to make valuable use of my time so if there is something more you would like to discuss please let me know or else we could discuss these through a phone call." In a separate email, to give another example, Vatalaro accused Yamasaki of wasting her time by failing to sufficiently clarify an assignment, writing: "You know, you could have saved a whole lot of time if you just would have said that an hour ago." And in another email, to give one last example, Vatalaro sent her an email with the subject line "Dear Fran"—again, in apparent reference to a former County employee who had a poor reputation as a manager. Not surprisingly, Yamasaki regarded Vatalaro as acting disrespectful and insubordinate in these instances.

Even Vatalaro acknowledged her shortcomings at one point, at least in part. According to her own notes, during a phone call with Yamasaki, Yamasaki described "how difficult it's been working with [Vatalaro] because she has felt that [Vatalaro] ha[s] been distant and unwilling to cooperate." In attempting to justify her conduct, Vatalaro noted that Callejas had told her before she started her new role that Yamasaki "didn't want [her] in the management position." She then asked: "[H]ow do you expect me to react when I'm being told that I'm moving under a manager who doesn't want me and was forced to move me into the position . . . ?" Even Vatalaro, then, appeared to at least acknowledge that she had been "difficult" to work with, "distant," and "unwilling to cooperate."

Considering these and other facts in the record, we conclude that the County's undisputed evidence would require a reasonable factfinder to find it "highly probable"

21

that the County's decision to release Vatalaro from probation would have occurred for legitimate, independent reasons even if Vatalaro had not complained about working on low-level assignments. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012 [discussing appellate review of findings made under the clear-and-convincing evidence standard].) We find, that is, that the County presented sufficient undisputed evidence to satisfy its burden under section 1102.6 on summary judgment. We also find that Vatalaro failed to raise any triable issue of material fact that would preclude summary judgment in this case.

Although Vatalaro's claims the County's evidence falls short for several reasons, we find none of her arguments raise a triable issue as to any material fact. She first attempts to mischaracterize the County's reasoning for dismissing her. In her telling, the County's "underlying facts supporting a release from probation rest solely on the fact that Vatalaro was not a 'potted plant' and that she continued to try to right what she perceived was a wrong—the fact that she was being forced to work below class without any recourse." But that is not a fair characterization. As covered, Yamasaki detailed specific instances in which Vatalaro had been "insubordinate, disrespectful, and dishonest." And again, even Vatalaro appeared to acknowledge that she had been "difficult" to work with, "distant," and "unwilling to cooperate." Vatalaro's contrary characterization of the facts finds no support in the record.

Vatalaro also argues that the County's stated reasons for releasing her from probation were "factually baseless" because she "was a competent employee," "was never coached or disciplined," and "was never provided assignments where she could manage or provide leadership." But all these arguments are either immaterial or lack evidentiary support. First, we accept that Vatalaro was generally "a competent employee." Even the County does not appear to dispute this point. But Vatalaro's general competency as an employee is not material to this case, which concerns the County's adverse employment action based on her "insubordinate, disrespectful, and

22

dishonest" conduct, not the quality of her work. Second, although Vatalaro contends she "was never provided assignments where she could manage or provide leadership," she fails to support her contention with supportive facts. And in any event, in her memorandum recommending Vatalaro's release, Yamasaki noted that she tried to place Vatalaro in charge of managing data entry staff. But Vatalaro called it "a dump job," complained "there were lots of personnel problems with staff in the unit," and stated that Moore should continue to supervise the unit—something that Vatalaro never appears to have disputed. Lastly, although Vatalaro claims that she was "never coached or disciplined," her record citations only show that she was never coached or disciplined in writing. According to Yamasaki and Callejas, however, she was coached and disciplined orally. Yamasaki testified that she gave Vatalaro an "oral warning," expressed "concern[] about her probationary status," and "coach[ed] her on areas of improvement." Callejas, in turn, testified that she coached Vatalaro about steps she could take to "work better with [Yamasaki]," including advising her to be careful on her use of sarcasm. Vatalaro never disputes this testimony. Nor does she dispute that, before her release, Yamasaki and Moore prepared a written agenda discussing her perceived shortcomings and discussed these issues with her in a meeting.

Vatalaro next suggests that the County's stated reasons should not be accepted because "[n]either of Vatalaro's supervisors involved with writing and signing the letter [recommending release] verified any of the facts which formed the basis for Vatalaro's release from probation." Vatalaro, in other words, appears to fault Yamasaki for relying solely on unverified complaints against Vatalaro to justify her decision recommending Vatalaro's release from probation. But nothing in the record supports her claim. Yamasaki made clear that she relied principally on her own personal interactions with Vatalaro. She noted, for instance, that she heard Vatalaro repeatedly call meetings a waste of time, she received an email from Vatalaro refusing to meet with her because she thought it would not be a "valuable use of [her] time," and she heard Vatalaro claim that

23

"she could not complete her work as she could not talk directly to" a co-worker during a meeting, even though Vatalaro later conceded that she in fact "did participate in the meeting by talking and asking questions." As this and other evidence show, Yamasaki did not rely solely on unverified complaints against Vatalaro, as Vatalaro suggests; she instead relied principally on her own personal interactions with Vatalaro.

Finally, Vatalaro suggests that two of the County's stated reasons could not support the decision releasing her from probation. First, she asserts that Yamasaki claimed she "did not get along with staff . . . based upon an incident that occurred in 2013—two years before Vatalaro took the ASO III position." Second, she claims that Yamasaki accused her of lying after she reported that Yamasaki and Moore had harassed her. But Vatalaro's arguments appear to be premised on a misunderstanding of the record. Nothing in Yamasaki's memorandum recommending Vatalaro's release alludes to Vatalaro's failure to get along with staff in 2013 nor accuses Vatalaro of raising false claims of harassment. And although Yamasaki's memorandum, as discussed, detailed various specific incidents when Vatalaro allegedly acted insubordinate, disrespectful, and dishonest, Vatalaro generally, if not entirely, ignores these incidents.

In sum, because the County met its burden under section 1102.6 to show that it would have released Vatalaro from probation for legitimate, independent reasons even if Vatalaro had never complained about her assignments, and because Vatalaro has failed to raise any triable issue of material fact on this issue, we conclude that the trial court properly granted judgment in the County's favor. (Cf. *Gonzalez v. City of New York* (S.D.N.Y. 2020) 442 F.Supp.3d 665, 697-698 [finding, under a framework similar to the one described in section 1102.6, that the "Defendants have met their burden to show that they would have failed to interview [an employee for a position] even if he had never filed the Internal Grievance or lodged other complaints," based on evidence the employee "was excessively absent and insubordinate and lied [about his job title] on [a] questionnaire"] *aff'd Gonzalez v. City of New York* (2d Cir. 2021) 845 Fed.Appx. 11.)

24

DISPOSITION

The judgment is affirmed.  The County is entitled to recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a).)



_____\s\_____,
BLEASE, Acting P. J.


We concur:


\_\_\_\_\_\s\_____,
HULL, J.


\_\_\_\_\_\s\_____,
KRAUSE, J.

25

Filed 6/1/22

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CYNTHIA VATALARO,<br><br>　　　　Plaintiff and Appellant,<br><br>　　v.<br><br>COUNTY OF SACRAMENTO,<br><br>　　　　Defendant and Respondent. | C090896<br><br>(Super. Ct. No. 34-2017-00207387-CU-WT-GDS)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in the above-entitled matter filed on May 5, 2022, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

1

EDITORIAL LISTING

APPEAL from a judgment of the Superior Court of Sacramento County, David I. Brown, Judge.  Affirmed.

Neasham & Kramer, LLP, Patricia Kramer and Chad A. Vierra for Plaintiff and Appellant.

Longyear & Lavra, LLP, John A. Lavra and Kelley S. Kern for Defendant and Respondent.

BY THE COURT:


   \s\                          ,
BLEASE, Acting P.J.


   \s\                          ,
HULL, J.


   \s\                          ,
KRAUSE, J.

2